**Louise MILAN, Plaintiff–Appellee,**

v.

**Billy BOLIN, in his individual capacity as Evansville Police Department Chief, et al., Defendants–Appellants.**

**No. 15–1207.**

United States Court of Appeals, Seventh Circuit.

Argued June 1, 2015.

Decided July 31, 2015.

Benjamin Reed Aylsworth, Attorney, Kyle F. Biesecker, Attorney, Andrew Dutkanych, III, Attorney, Biesecker, Dutkanych & Macer, LLC, Evansville, IN, for Plaintiff–Appellee.

Robert Burkart, Attorney, Keith W. Vonderahe, Attorney, Ziemer, Stayman, Weitzel & Shoulders, Evansville, IN, for Defendants–Appellants.

Before WOOD, Chief Judge, and POSNER and WILLIAMS, Circuit Judges.

POSNER, Circuit Judge.

The plaintiff brought suit against the City of Evansville, Indiana, and several of the City's police officers, contending that the police had used excessive force in the search of her home. The district judge granted summary judgment in favor of the defendants on related claims by the plaintiff, but all that is before us is the defendants' appeal from the district judge's denial of their motion for summary judgment on the excessive-force claim. They argue that qualified immunity insulates them from liability—that is, that there was no established legal principle that would have informed them that they were using excessive force.

On June 20, 2012, the Evansville police department became aware of Internet postings that made threats against the police; a typical posting said "New Indiana law. You have the right to shoot cops." The posts came from an Internet Protocol (IP) address at the home of 68–year–old Louise Milan and her 18–year–old daughter Stephanie (plus another daughter who wasn't however at home during the search).

An IP address is like a phone number, but it is a number that identifies a computer or computer network and so enables a person operating another computer to communicate with it. The network in Mrs. Milan's home was an unsecured WiFi network, meaning that a person in the vicinity of the home—standing in the street in front of the house, for example—could access the network and send messages from it without needing to know a password. The threats against the police could have been posted by someone in her house on her computer, but equally they could have

been posted through the unsecured network by someone near the house.

That the threats *might* have come from a person (or persons) inside the Milan home who *might* moreover be armed and dangerous was enough to make the police decide to have the house searched by the department's SWAT team forthwith, though, to repeat, the threatening messages could instead have emanated from outside the house because of the open network.

The defendants say they didn't know that Mrs. Milan's network was unsecured and therefore accessible by someone outside the house who could use the unsecured network to send the threatening messages. Although the police had discovered that there was an unsecured network near the house, they hadn't bothered to find out whose network it was, as they could easily have done, precisely because it was unsecured and therefore accessible. Had they done that they would have known that it was Mrs. Milan's network and, since it was unsecured, that it might have been used (without her knowledge) by someone outside her home to send the threatening messages. The failure to discover that the network was Mrs. Milan's was a failure of responsible police practice.

The search was conducted on June 21, just one day after the discovery of the posted threats. Shortly before the search, police had spotted on the porch of a house just two doors from the Milan house a man named Derrick Murray, whom they knew to have made threats against the police in the past—indeed he had been convicted of intimidating a police officer. At least two of the officers thought him the likeliest source of the threats. Prudence counseled delaying the search for a day or so to try to get a better understanding both of the Milan household and of Murray's potential responsibility for the threats. Prudence went by the board.

Some officers thought, mistakenly as it turned out, that one or more of three men whose last name was the same as Mrs. Milan's were likely threateners. One of them, Marc Milan, was believed to be a member of a gang and the nephew of Mrs. Milan's deceased husband, though in her deposition in this case she described him as a near stranger whom she had met for the first time *after* the search. The second male Milan, Anthony Milan Sr., was a sex offender who had committed other types of crime as well. He was Mrs. Milan's stepson and had lived in her house years prior to the search. The third male Milan, Anthony Milan Jr., was the son of the second Milan. His Facebook pictures show him holding guns. He was only an occasional visitor to his stepgrand-mother's house.

At the time of the search only Mrs. Milan and her daughters were living in the house. No man was living, staying, or visiting there, and police surveillance revealed no man entering or leaving between the threats and the search. Police did see daughter Stephanie come and go from the house. She happens to be small for an 18–year–old—one of the officers who saw her thought she was 13 and the other that she was 15. We'll see that her size and apparent age are relevant to the appeal.

So: a house occupied by an elderly woman and her two daughters; no evidence that any criminals would be present during the search although the possibility could not be excluded entirely; no effort to neutralize suspect Murray during the search, as by posting police to watch his house and make sure he didn't rush over to Mrs. Milan's house when the search began. But despite their insouciance about Murray and the perfunctory character of their investigation before the search, the police decided to search the Milan house—and in a violent manner.

A search warrant was applied for and obtained, and the search was conducted by an eleven-man SWAT team accompanied by a news team. The members of the SWAT team rushed to the front door of the house, knocked, and without allowing a reasonable time—more than a few seconds—for a response (though they hadn't gotten a "no knock" warrant; see *Hudson v. Michigan*, 547 U.S. 586, 589, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006)) broke open the front door and a nearby window, and through these openings hurled two "flash bang" grenades. These are explosive devices, similar to but a good deal less lethal than military hand grenades, that are intended to stun and disorient persons, thus rendering them harmless, by emitting blinding flashes of light and deafening sounds. They can kill if they land on a person, especially a child. The police call them "distraction devices," an absurd euphemism; we called them "bombs" in *Estate of Escobedo v. Bender*, 600 F.3d 770, 784–85 (7th Cir.2010), and *United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir.2000).

As the flash bangs exploded, the police rushed into the house, searched it from top to bottom (finding no males, and also no evidence of any criminal activity), handcuffed mother and daughter, led them out of the house, and questioned them briefly. (The newsmen did not enter the house; had they done so, this would have been an independent violation of the Fourth Amendment, *Wilson v. Layne*, 526 U.S. 603, 611, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), because the warrant did not authorize them to participate in the search.) The mother's and daughter's answers to the questions put to them by the police convinced the police that the women had had nothing to do with the threats, and so they were released to return to their damaged and smoking abode. The City of Evansville replaced the broken door and window, and the burned rug, at the City's expense. There was doubtless other damage; we don't know whether the City paid for any of it. (Nor do we know the nature and amount of the damages sought by Mrs. Milan in this suit, though we are guessing that the principal harm for which compensation is sought is emotional. Nor do we know why Stephanie is not also a plaintiff.)

That no men were found in the house during the raid confirmed the police in their belief that Murray was responsible for the threats. It took them only a day to discover that it was indeed he who was responsible—he had used Mrs. Milan's open network to threaten the police. But rather than give him the SWAT-team treatment, the police politely requested that he come to police headquarters, which he did, where he was arrested without incident. (He was prosecuted for the threats, pleaded guilty, and was given a sixteen-month prison sentence.) The police department's kid-gloves treatment of Murray is in startling contrast to their flash-bang assault on Mrs. Milan's home.

The search of her home was videotaped both by the accompanying news team and by a camera mounted on the helmet of a member of the SWAT team. The members of the team are seen on the tapes impressively clad in body armor and big helmets and carrying formidable rifles pointed forward. It would take a brave criminal to try to fight it out with them, and of course there was no criminal in the house and little reason to expect one to be there. The handcuffing of the daughter, looking indeed much younger than her 18 years, is shown on the helmet video along with the rest of the search, and she is so small, frail, utterly harmless looking, and completely unresisting that the sight of her being led away in handcuffs is disturbing. All that the SWAT officer had to do was take her by the hand and lead her out of the house, which was rapidly filling with smoke from the flash bangs; there was no

conceivable reason to handcuff her. From what we can observe on the videos, all the members of the SWAT team were white, Mrs. Milan and her daughter black; the broadcasting of the videotape cannot have helped race relations in Evansville.

■ Police are not to be criticized for taking threats against them and their families seriously. But flash bangs are destructive and dangerous and not to be used in a search of a private home occupied so far as the police knew only by an elderly woman and her two daughters. We cannot understand the failure of the police, before flash banging the house, to conduct a more extensive investigation of the actual suspects: Murray, living two doors away from the Milan home and thus with ready access to Mrs. Milan's open network, and the male Milans. The police neglect of Murray is almost incomprehensible. His past made him a prime suspect. A day of investigating him would have nailed him, as we know because a day of investigating—the day after the violent search of the home—did nail him. The district judge's denial of the defendants' motion for summary judgment appears eminently reasonable when one puts together the flash bangs, the skimpy basis for the search and its prematurity—the failure to check whether the network was open and the failure to conduct a more extensive investigation before deciding that flash bangs were appropriate means of initiating the search, the resulting neglect of Murray, and the handcuffing of the daughter.

True, we mustn't base our decision on the wisdom of hindsight. If the police had had reasonable grounds for conducting the search as they did (that is, with flash bangs, yet without any but the most perfunctory, indeed radically incomplete, preliminary investigation), then the doctrine of qualified immunity would shield them from liability even though the flash bangs

and ensuing search yielded no benefits for law enforcement. But, to repeat for emphasis, the police acted unreasonably and precipitately in flash banging the house without a minimally responsible investigation of the threats. The open network expanded the number of possible threateners and just one extra day of surveillance, coupled with a brief investigation of Murray and the three male Milans, should have been sufficient to reassure the police that there were no dangerous men lurking in the house.

Precipitate use of flash bangs to launch a search has troubled us before, leading us to declare that "the use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher." *Estate of Escobedo v. Bender, supra,* 600 F.3d at 784–85. The police in this case flunked the test just quoted. True, they'd brought a fire extinguisher with them— but, as if in tribute to Mack Sennett's Keystone Kops, they left it in their armored SWAT vehicle.

■ So while the defendants are correct to point out that a reasonable mistake committed by police in the execution of a search is shielded from liability by the doctrine of qualified immunity, *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), in this case the Evansville police committed too many mistakes to pass the test of reasonableness.

AFFIRMED