# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3365
_____

Z.J., a minor, by and through her next friend, Je'tuan Jones

*Plaintiff - Appellee*

v.

Kansas City Board of Police Commissioners, through its members: Alvin Brooks, Michael Rader, Angela Wasson-Hunt, Sylvester James, and Leland Shurin; Jason Rusley; Michael Jones; Barbara Eckert; Caleb Lenz; William Nauyok; Eric Enderlin; Charles Evans; Robert Jorgenson; Robert McLaughlin; and Venasa Ray, in their individual and official capacities

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Western District of Missouri - Western Division
_____

Submitted: November 13, 2018
Filed: July 25, 2019
_____

Before GRUENDER, KELLY, and GRASZ, Circuit Judges.
_____

GRASZ, Circuit Judge.

Detectives with the Kansas City Police Department ("KCPD") obtained a search warrant for what they mistakenly believed was a homicide suspect's residence.

After the suspect was apprehended and arrested at another location, the detectives, hoping to find the homicide victim's cell phone and other evidence, had a SWAT team execute the search warrant. When the SWAT team knocked on the door, a young woman opened the inside front door and held up her keys to indicate she was going to unlock the screen door. Even though the SWAT team knew the suspect was already in custody, they broke open the screen and threw a flash-bang grenade into the living room of the home before the young woman could open the door.

As it turned out, the suspect had not lived at the residence for some time and the only people inside were three women (two of them elderly) and a two-year old girl. The two-year old girl suffered Post-Traumatic Stress Disorder ("PTSD") from the blast of the flash-bang grenade. She sued the SWAT team officers, the detectives, and the Kansas City Board of Police Commissioners ("the Board") under 42 U.S.C. § 1983. The district court denied the defendants' motion for summary judgment and the defendants appealed. We affirm as to the SWAT team officers, reverse as to the detectives, and dismiss for lack of jurisdiction as to the Board.

## I. Background

In October 2010, three homicide detectives with the KCPD, Barbara Eckert, Michael Jones, and Venasa Ray ("the detectives"), began investigating a homicide. As the victim's cell phone was missing, the detectives obtained call records for the phone after the time of the murder, as well as the GPS coordinates for those calls. The victim's phone had been used after the murder to call a residence on Bristol Avenue ("the Bristol residence") in Kansas City, Missouri. Using a database containing criminal history information from regional law enforcement agencies and

motor vehicle records, the detectives learned that an individual named Lee Charles[1] resided at the Bristol residence.

The next morning, the detectives learned the victim's phone was turned on and was within 80 meters of a particular intersection, an area including both the Bristol residence and two apartment buildings on Winchester Avenue ("the Winchester apartments"). Eckert and another detective arrived at the area to locate the phone. While standing between the two Winchester apartments, the detectives could hear a phone ringing when a third officer called the victim's phone number, although they could not pinpoint its exact location. When more officers arrived, they again tried to locate the phone, but it appeared the battery had died or the phone had been turned off.

That evening, police learned the victim's phone was in the area of a particular intersection in Grandview, Missouri. A detective called the phone. Someone answered the call, but did not respond. The detective heard background noises that sounded like a restaurant kitchen. The detectives sought the names of employees working that evening from five restaurants in the area. Charles was working at one of those restaurants that evening.

Records from the victim's phone also showed it had been used after the murder to call a Family Dollar store. The detectives obtained a list of employees and contact information from the store manager. Charles was listed as an employee and his address was listed as the Bristol residence.

Charles was arrested in the afternoon of November 3. The same day, Detective Jones applied for a search warrant for what was believed to be Charles's residence on

---

[1]While he was initially a suspect, it was eventually discovered that another individual — not Charles — had committed the homicide.

Bristol Avenue. The warrant application omitted the fact the detectives had heard the victim's phone ringing in the Winchester apartments — not at the Bristol residence. At 3:00 p.m., the warrant was issued, authorizing police to search for and seize cell phones (including cell phones matching the description of the victim's phone), clothing or shoes with blood, knives with trace evidence, items that could be used for strangulation such as cords, wire, or rope with trace evidence, and the victim's keys.

Detective Jones contacted Sergeant Rusley of the KCPD Tactical Response Team about executing the search warrant at the Bristol residence. At 6:15 p.m., Rusley conducted a briefing with the detectives, as well as Tactical Response Team members Robert Jorgenson, Caleb Lenz, William Nauyok, Robert McLaughlin, Eric Enderlin, and Charles Evans ("the SWAT team"). The SWAT team was informed that Charles had already been taken into custody. After the briefing, officers drove by the Bristol residence to confirm the address. No other surveillance of the house was done to learn who resided there.

At 7:00 p.m., the SWAT team, dressed in tactical gear with weapons drawn, approached the front door of the Bristol residence. The front entrance had both an inside wooden door and an outside metal screen door, each of which were "double-keyed," meaning they required a key to open from both the inside and the outside. Because the warrant did not authorize a "no knock" entry, the SWAT team knocked on the door and announced: "Police, search warrant!" At the time, there were four people inside the residence: the plaintiff, Z.J., a two year old girl; Laverne Charles, age 84; Leona Smith, age 68; and Carla Brown, age 24. Carla grabbed the keys to the door and opened the inside door.

What happened next is disputed. According to Carla, when she opened the inner door, she saw through the screen door a lot of people outside, yelling, which startled her. She later said she didn't know whether she backed away from the screen

-4-

door when she first saw the officers. She then held up the keys to the door in her hand and jingled them for the SWAT team to see in order to indicate that she was going to open up the door.[2] Before she had the opportunity to open it, the SWAT team knocked out the screen and threw in a flash-bang grenade over Carla's head into the living room of the house. Carla testified that she would have opened the screen door had she been given the opportunity to do so.

According to Sgt. Rusley, the SWAT team waited five to ten seconds after knocking the first time before beginning to knock again. As they began knocking on the door the second time, the team was preparing to pry open the screen door with a device. At the same time, Carla opened the inside door. Rusley claimed that "she refused [to open the screen door] and walked away," after which they breached the screen door and threw in the flash-bang grenade. He explained that the flash-bang grenade was deployed because the SWAT team was "compromised," meaning "that occupants of the residence knew we were there and that we no longer had the element of surprise."

Officer Jorgenson gave a slightly different account to the KCPD's Internal Affairs Unit, confirming part of Carla's account and stating that she only "took a couple of steps back" before she "froze there" and then "waived a set of keys":

> [As the SWAT team knocked on the door a second time,] we were getting ready to set the hooligan tool into the doorframe and then the front door was open[ed] from the inside of the house and the lady was standing there. As soon as she saw us, she took a couple of steps back.

---

[2]Carla's testimony is corroborated by statements made by Leona in an interview with KCPD Internal Affairs. On summary judgment, the defendants objected to the plaintiff's use of these statements by Leona, who is now deceased, as hearsay. The district court does not appear to have ruled on the hearsay objection. We do not consider Leona's statements in reaching our decision.

I'm sure she was in fear of what was going on. I told her to open the door and she just kind of froze there. At one point she began to turn away as we were still yelling at her to open the door. She waived a set of keys. At the time, I had no idea what that meant. The sergeant announced "hit it," which means make entry into the residence. The officer that had the hooligan tool took a swipe at the door attempting to punch a hole in it so that we could access it with our hand and then unlock it. After producing a hole in the door, the point-man reached in, in an attempt to unlock it, only to find out it was a keyed lock. So then we set the hool[igan tool] into the side of the door, hit it with the ram and pr[i]ed the door open. Due to the fact it took us a longer than the normal amount of time to get into the residence, the sergeant deployed a noise flash diversionary device into the living room of the structure.

The flash-bang grenade caught the living room drapes on fire. The SWAT team had to remove the drapes from the house and place them in the front yard before continuing through the rest of the house. The SWAT team found two-year old Z.J. in the living room. One officer acknowledged Z.J. was "very shaken from the whole situation." The team placed Carla and Leona in zip tie restraints, but was unable to place restraints on Laverne because of her advanced age and physical condition.

After the SWAT team cleared the house, the detectives, who had been waiting a block away, took control of the house. The detectives had Carla and Leona released from the restraints. They also learned that Charles no longer resided there and had been kicked out several months earlier. Charles was living a block away in an apartment with another individual and did not have any property at the Bristol residence.

After the SWAT team raid, Z.J. suffered significant developmental regression and was diagnosed with PTSD. In August 2015, Z.J., through her next friend Je'taun Jones, sued the detectives, the SWAT team members, and the Board (through its

members)[3] for violations of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983. As to the detectives, Z.J. alleged they omitted information on the warrant application about hearing the victim's phone ringing inside the Winchester apartments. She also alleged they failed to conduct a sufficient investigation prior to executing the warrant and then unjustifiably chose to have the SWAT team execute the search. As to the members of the SWAT team, she alleged they used excessive force by throwing a flash-bang grenade into the residence. And as to the Board, she alleged its policies and practices were deliberately indifferent to the unconstitutionally excessive use[4] of flash-bang grenades by the KCPD.

---

[3]In their arguments, the parties categorize the several defendants into these three groups. The Appellants have not argued the claims against any individual defendant should be treated differently from other defendants in the same group (e.g., the SWAT team officers who did not authorize or throw the flash-bang grenade may not be liable even if those who did are liable). Following the parties' lead for purposes of this appeal, we analyze the claims against the detectives, the SWAT team, and the Board as they relate to those groups, rather than each individual defendant separately.

[4]On summary judgment, the plaintiff presented evidence to support what was alleged to be excessive use of SWAT teams to execute search warrants and excessive use of flash-bang grenades by those SWAT teams. KCPD policy provided that "Uniformed/tactical entry personnel will be used for making entry during the execution of all search warrants," but also stated that "[n]ot every search warrant will require the presence of uniformed/tactical entry personnel, e.g., warrants served on a safe deposit box or an impounded vehicle." As the district court noted, the Board did not have any policy about the use of flash-bang grenades — such as when their use is appropriate and how to use them safely. One officer estimated that in executing search warrants, flash-bang grenades were used 80-90% of the time; another officer estimated that in his experience they were used about 50% of the time; and a third officer estimated they were used about 75% of the time.

The defendants moved for summary judgment, with the individual defendants' motions based on qualified immunity. The district court denied the motions and the defendants timely appealed.

## II.  Analysis

The Appellants argue the district court erred in denying their motion for summary judgment. A party is entitled to summary judgment where it "shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an appeal from a denial of summary judgment based on qualified immunity, we have appellate jurisdiction to review the decision "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We do not review the "district court's determination about what factual issues are 'genuine.'" *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Rather, our review "is limited to the purely legal issue of whether the facts alleged support a claim of violation of clearly established law." *Berry v. Doss*, 900 F.3d 1017, 1021 (8th Cir. 2018) (cleaned up) (quoting *Mallak v. City of Baxter*, 823 F.3d 441, 445–46 (8th Cir. 2016)). However, "[t]here is one exception to such a jurisdictional limitation on our review: we may reject the district court's factual findings to the extent that they are 'blatantly contradicted by the record.'" *Wallace v. City of Alexander*, 843 F.3d 763, 767 (8th Cir. 2016) (quoting *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014)).

### A.  The SWAT Team

The Appellants argue the district court erred by denying summary judgment to the SWAT team officers because they did not violate the Fourth Amendment, and in any event, are entitled to qualified immunity because they did not violate clearly

established law. We disagree. Any reasonable officer would have known the use a flash-bang grenade under these circumstances constituted excessive force.

Congress enacted 42 U.S.C. § 1983 in the Civil Rights Act of 1871 to "establish[ a] cause[] of action for plaintiffs to seek money damages from Government officers who violated federal law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870 (2017) (Thomas, J., concurring in part and concurring in the judgment). Though the text of § 1983 contains no provision of immunity, the Supreme Court has recognized a qualified immunity which "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity entails a two step analysis: first, determining whether "the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and second, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

We first address the initial step of the qualified immunity analysis, which in this procedural context is: whether, viewing the evidence in the light most favorable to Z.J., the SWAT team officers are entitled to judgment as a matter of law.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (quoting *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006)). This evaluation "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the

countervailing governmental interests at stake," and must be done "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The reasonableness of the use of flash-bang grenades depends upon the circumstances. *See generally Milan v. Bolin*, 795 F.3d 726, 729–30 (7th Cir. 2015). Certainly, they can be an important tool for law enforcement officers to gain an element of surprise while entering a dangerous environment and can at times obviate the need for officers to use deadly force. *See Boyd v. Benton Cty*., 374 F.3d 773, 779 (9th Cir. 2004) ("[W]e recognize that less-than-lethal alternatives are intended to avoid unnecessary fatalities.").

But these weapons also carry serious risks. *See Milan*, 795 F.3d at 729–30. The record evidence shows the flash-bang grenade used here is four times louder than a 12-gauge shotgun blast and emits a light 107 times brighter than the brightest high-beam vehicle headlight. It has a powerful enough concussive effect to break windows and put holes in walls. The flash-bang burns at around 5,000 degrees Fahrenheit, creating an obvious and serious risk of burning individuals, damaging property, and starting fires (as occurred here). In some cases, they can even be lethal. And as this case illustrates well, they pose a risk of traumatizing unsuspecting occupants — particularly small children like two-year old Z.J.

While the reasonableness of the use of flash-bang grenades while executing a warrant is not reducible to a simple and categorical rule, several considerations guide our analysis. Most importantly, we consider whether officers had reason to believe they would encounter a dangerous, violent suspect. *See Estate of Escobedo v. Bender*, 600 F.3d 770, 784–86 (7th Cir. 2010). Their use is more likely to be reasonable if the officers expect to encounter an individual who is known to be armed

and dangerous or who has a history of violence. Their use is also more likely to be reasonable if the situation presents a need for the element of surprise in order to protect the safety of officers or others. *See Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003) (concluding use of flash-bang grenade was reasonable in part because "the officers had ample reason to be concerned about their personal safety"); *Boyd*, 374 F.3d at 779 ("There are likely circumstances in which a risk to officers' safety would make the use of a flash-bang device appropriate."). On the other hand, their use is less likely to be reasonable if officers unreasonably fail to ascertain whether innocent bystanders will be present in the area the flash-bang grenade is deployed. *See Milan*, 795 F.3d at 729–30; *Boyd*, 374 F.3d at 779; *United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir. 2000).

Whether the use of the flash-bang grenade here was reasonable is not a close question. The SWAT team knew the suspect, Charles, was already in custody. Any potential justification based on the fact Charles was (at the time) suspected of murder is eliminated by the fact the SWAT team knew they would not encounter Charles there. Nor did they have any indication that other people at the residence would pose any threat. In fact, they had no idea who was inside the house because they failed to do any investigation into that question beyond a quick drive-by to check the address. The use of a flash-bang grenade under these facts was not reasonable. "The use of a [flash-bang] grenade must be justified by the particular risk posed in the execution of the warrant." *Terebesi v. Torreso*, 764 F.3d 217, 239 (2d Cir. 2014). Nor was the manner of use reasonable. They threw the flash-bang grenade into the house blindly without knowing whether children, elderly, or other innocent individuals were inside.

The Appellants argue the use of the flash-bang was reasonable because the SWAT team may have still faced danger in spite of Charles already being in custody. After all, they posit in their brief, the murder "*could have* been part of a robbery by

-11-

a group of criminals," and Charles's arrest "*could have* tipped the others off that a search or arrest was imminent." Of course, they had no actual information to support this after-the-fact speculation. More to the point, however, this argument relies on a dangerously flawed premise. The argument that the SWAT team was justified in using a flash-bang grenade because they did not know for certain it was unnecessary is precisely backwards; it makes using that dangerous level of force the default. This type of "flash-bang first, ask questions later" approach runs headlong into the Fourth Amendment. Law enforcement officers like the SWAT team members here need an actual justification for using a flash-bang grenade; the mere *hypothetical possibility* that someone dangerous could be in a house they are entering — without any actual facts to indicate that is true or likely to be true — is not sufficient. *See Milan*, 795 F.3d at 730; *Terebesi*, 764 F.3d at 236–239; *Boyd*, 374 F.3d at 779.

Nor was the use of the flash-bang grenade justified by anything Carla did when opening the door. Some of the factual details on what happened when she opened the inside door are in dispute, and the facts must be read in the light most favorable to the plaintiff. Carla held up her keys to indicate to the SWAT team her intention to unlock the screen door. But before she could get the door open, the officers broke open the screen and threw in a flash-bang grenade over her head. The explanation that the flash-bang was used because the SWAT team believed it was "compromised," meaning "that occupants of the residence knew [the SWAT team officers] were there and that [the officers] no longer had the element of surprise," is unpersuasive. The search warrant did not authorize the SWAT team to conduct a "no-knock" warrant, and so they knocked on the front door and announced their presence, which obviously defeated the element of surprise. After all, the purpose of the constitutional knock-and-announce requirement is to allow a citizen the chance to come to the door and allow entrance to an officer who is legally entitled to enter. *See Wilson v. Arkansas*, 514 U.S. 927, 931–36 (1995). Even assuming, as Officer Jorgenson stated, that Carla

took a couple of steps backwards and then "froze there," the officers were not justified in blindly throwing a flash-bang grenade into the residence. They had no reason to believe Carla or anyone else inside posed any danger to them. The SWAT team's use of the flash-bang grenade was unreasonable and violated the Fourth Amendment.

As the second step of the qualified immunity analysis, we address "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. In making this determination, "the focus is on whether the officer had fair notice that her conduct was unlawful . . . ." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Thus, the Supreme Court has said that "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To satisfy this fair notice requirement, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not required that there be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)).

The "clearly established" requirement of qualified immunity provides officers with ample room for honest mistakes, but the SWAT team officers' conduct falls outside even this generous standard. First, the use of the flash-bang grenade was unreasonable under all of the relevant case law. Second, it would have been obvious

-13-

to any reasonable officer that the use of the flash-bang grenade under those circumstances was unreasonable.

The Supreme Court has established that, broadly speaking, "[i]n executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." *Los Angeles Cty. v. Rettele*, 550 U.S. 609, 614 (2007). At a narrower level, *see al-Kidd*, 563 U.S. at 742 (instructing courts not to "define clearly established law at a high level of generality"), the relevant case law clearly established that the use of flash-bang grenades is unreasonable where officers have no basis to believe they will face the threat of violence and they unreasonably fail to ascertain whether there are any innocent bystanders in the area it is deployed. It is true this court has not yet addressed the reasonableness of the use of flash-bang grenades, but many other courts have.[5] *See Bender*, 600 F.3d at 784–86 (stating "the use of a flash bang device is justified when 'potentially *violent* people [can] be found in [a] house,' as opposed to individuals who pose no threat to the police or others" (quoting *United States v. Folks*, 236 F.3d 384, 388 n.2 (7th Cir. 2001)); *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007) (considering such factors as whether the defendant had a history of violent crime and was armed and the need for the element of surprise); *Boyd*, 374 F.3d at 779 (stating that "it cannot be a reasonable use of force under the Fourth Amendment to throw [a flash-bang grenade] 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives

---

[5]The Appellants apparently argue the "clearly established" analysis must involve *only* looking to cases from the relevant circuit and the Supreme Court. It is true plaintiffs can show a right is clearly established by pointing to "cases of controlling authority *in their jurisdiction* at the time of the incident," but they may also do so by pointing to "a consensus of cases of persuasive authority" — including cases from other jurisdictions. *Wilson v. Layne*, 526 U.S. 603, 617 (1999) (emphasis added); *Keefe v. Adams*, 840 F.3d 523, 541 (8th Cir. 2016).

and appropriate measures to reduce the risk of injury"); *Molina*, 325 F.3d at 973 (concluding the use of a flash-bang grenade was reasonable because suspect had a violent criminal record and it was not used around the suspect's wife and children).

The dissent on this issue relies on the Eleventh Circuit's opinion in *Dukes v. Deaton*, 852 F.3d 1035, 1044 (11th Cir. 2017), to conclude the SWAT team here did not violate clearly established law, *post* at 25–27. But in *Dukes*, the defendant officer was executing a "no-knock" search warrant in a house in which drug trafficking was known to occur and at which a drug dealer resided who was known to carry a handgun. The Eleventh Circuit's conclusion that there was no violation of clearly established law was based, at least in part, on its consideration of that danger faced by the officer. *See Dukes*, 852 F.3d at 1044. Our conclusion is wholly consistent with *Dukes*. Similarly, the cases from other circuits cited by the dissent that found a constitutional violation but no violation of clearly established law are not inconsistent with our conclusion. Each of those cases, like *Dukes*, involved a situation where officers faced the threat of a potentially armed and dangerous individual. *See Dukes*, 852 F.3d 1039–40; *Bing*, 456 F.3d at 559–62 (involving an armed and intoxicated individual who had already fired his weapon causing police to fear for their lives); *Boyd*, 374 F.3d at 777 (noting that officers knew armed criminals could be inside the apartment). Those cases can be read as inconsistent with our conclusion only by defining the right at issue at a very broad level of generality. *See al-Kidd*, 563 U.S. at 742. We do not hold that *every* unreasonable use of a flash-bang grenade is a violation of clearly established law. Rather, we hold only that it was clearly established in 2010 that the use of flash-bang grenades is unreasonable *where officers have no basis to believe they will face the threat of violence* and they unreasonably fail to ascertain whether there are any innocent bystanders in the area it is deployed.

The Sixth and Ninth Circuit cases cited by the dissent not only had differing facts but were addressing the clarity of the law as it existed in different times. *See generally Bing*, 456 F.3d 555 (involving a violation occurring in 2002); *Boyd*, 374 F.3d 773 (involving a violation occurring in 1997). Each case contributed to the growing clarity of the law on when the use of flash-bang grenades is appropriate. But more importantly, disagreement about whether the law was clearly established does not equate to disagreement about the law itself. Under *all* of the relevant case law, the SWAT team officers' use of a flash-bang grenade in this situation would be unconstitutional. The court is not aware of, and neither the parties nor the dissent have pointed to, any case law in existence in 2010 under which the SWAT team's conduct would be constitutional.

Even aside from the consensus in persuasive case law at the time, the SWAT team officers violated clearly established law because it would be obvious to any reasonable officer that the use of the flash-bang grenade under these circumstances was unreasonable. For a right to be clearly established, it is not required that there be "a case directly on point." *al-Kidd*, 563 U.S. at 741. An officer may have fair notice based on the fact his conduct is obviously unlawful, even in the absence of a case addressing the particular violation. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Brosseau*, 543 U.S. at 199 ("Of course, in an obvious case, [the Fourth Amendment reasonableness standard articulated at a high level of generality] can 'clearly establish' the answer, even without a body of relevant case law."); *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018). The only potential threat of which the SWAT team was aware was Charles, then a suspect in a murder investigation. But they knew Charles was in custody. They had no reason to believe any accomplices were involved in the murder and present in the residence. Nor did they take any precautions to avoid harming innocent bystanders. And the rationale that they were "compromised" is nonsense because it is undisputed they knocked and

-16-

announced their presence. Only the plainly incompetent officer announces his presence at a house with no known dangerous people and then decides to throw in a flash-bang grenade because the occupants know he is there. Nor does the fact it took longer than normal for the SWAT team to gain entry provide any support for their decision. They could not have reasonably believed that "safety concerns necessitated an expedited entry by using a flash-bang grenade" based on the delay, as the dissent posits, *post* at 29, because they had no reason to believe anyone inside posed any danger to them and the young woman who answered the door was unarmed and gave no indication she posed any threat. Even though they were investigating a homicide, they knew the sole suspect was already in custody and they had no reason to believe the residence harbored other dangerous individuals. Blindly throwing a flash-bang grenade into the residence under these circumstances was obviously unconstitutional.

The cases cited by the dissent do not lend any support to the position the SWAT team's use of the flash-bang grenade was not obviously unconstitutional. As discussed above, those cases each involved circumstances where officers knew or had reason to believe the residence in which the flash-bang grenade was used contained a potentially violent individual. Under the facts of this case, where the SWAT team had no basis to believe they would face the threat of violence and unreasonably failed to ascertain whether there were any innocent bystanders in the area the flash-bang grenade was deployed, their violation was obvious.

The SWAT team officers violated clearly established law when they used the flash-bang grenade. The district court did not err by denying summary judgment on qualified immunity to the SWAT team.

## B. The Detectives

The Appellants argue the detectives were entitled to summary judgment because (1) the information they omitted from the search warrant application was not material; and (2) their decision to use a SWAT team to execute the search warrant was not unreasonable or did not violate clearly established law. We agree the detectives are entitled to summary judgment because there was probable cause to support the search warrant, even considering the omitted information, and because their decision to use a SWAT team, regardless of whether it was reasonable, did not violate clearly established law.

### 1. Search Warrant

Z.J. argues the detectives unreasonably omitted from the search warrant affidavit that they had heard the victim's cell phone ringing in the Winchester apartments and argues that if that fact had been included, the affidavit would lack probable cause. We disagree.

The U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and requires that warrants shall be supported by probable cause. U.S. Const. amend. IV. "A warrant based upon an affidavit containing 'deliberate falsehood' or 'reckless disregard for the truth'" — including, as alleged here, material omissions of fact — "violates the Fourth Amendment." *Bagby v. Brondhaver*, 98 F.3d 1096, 1098 (8th Cir. 1996) (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *see also Morris v. Lanpher*, 563 F.3d 399, 402–04 (8th Cir. 2009) (analyzing a *Franks* claim involving alleged falsehoods and omissions).

-18-

To prove a *Franks* violation based on the omission of material from a search warrant application, a plaintiff must show "1) that facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *Williams v. City of Alexander*, 772 F.3d 1307, 1312 (8th Cir. 2014) (quoting *United States v. Box*, 193 F.3d 1032, 1035 (8th Cir. 1999)). "Probable cause to issue a search warrant exists if, in light of the totality of the circumstances, there is 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Shockley*, 816 F.3d 1058, 1061 (8th Cir. 2016) (quoting *United States v. Donnell*, 726 F.3d 1054, 1056 (8th Cir. 2013)).

The district court identified what it concluded was an inaccuracy and also a material omission in the search warrant affidavit. However, we conclude the affidavit was not inaccurate and, even considering the omitted information, there was probable cause to support the search warrant. Thus, there was no Fourth and Fourteenth Amendment *Franks* violation.

The district court stated that the search warrant affidavit inaccurately "indicated . . . that some independent verification had been made that . . . Charles actually lived at [the Bristol residence], when in fact there had been no independent verification." "[T]he only 'check' that the detectives performed was by looking at a computerized database," the court said. This conclusion is erroneous for two reasons. First, the affidavit never claimed "that some independent verification had been made" that Charles lived at the Bristol residence. It truthfully stated that "a check" showed he lived there. A check of the law enforcement database showed just that. Second, the court's assertion that no independent verification of Charles's residence was made is "blatantly contradicted by the record." *Wallace*, 843 F.3d at 767 (quoting *Walton*,

-19-

752 F.3d at 1116). The record shows the detectives also obtained a list of employees and their addresses from the Family Dollar store at which Charles worked, which listed his address at the Bristol residence.

The omission correctly identified by the district court is the fact the detectives heard the victim's phone ringing in the Winchester apartments. While we do not condone the selective omission of this fact, the affidavit would support probable cause even with its addition. The affidavit established: (1) the phone was traced to an area that included both the Bristol residence and the Winchester apartments; (2) the phone had been used to call the Bristol residence; (3) the phone had been used to call Charles's employer, Family Dollar; and (4) the phone had been answered in what sounded to be a restaurant and traced to an area that included the restaurant at which Charles was working at the time. Moreover, two separate sources indicated Charles lived at the Bristol residence. These facts provided probable cause to believe Charles had the victim's phone in his possession and lived at the Bristol residence. The fact the phone was heard in a nearby residence could have meant Charles took the phone with him when visiting someone there; cell phones are inherently mobile, after all. Even considering that the phone had been heard in the Winchester apartments at one point, there was still a "fair probability" to believe the phone and other evidence would be found at what was reasonably believed to be Charles's residence. *See Shockley*, 816 F.3d at 1061 (quoting *Donnell*, 726 F.3d at 1056). Because the search warrant would be supported by probable cause even with the addition of the omitted information, the district court erred in denying summary judgment to the detectives on this claim.

## 2. The Decision to use the SWAT Team

Z.J. argues the detectives' authorization to use the SWAT team for executing the search warrant was unreasonable because they conducted no pre-search investigation other than a brief drive by the house to confirm the address and had no reason to believe a SWAT team was necessary. We do not decide whether the detectives' decision violated the Fourth Amendment but instead conclude they are entitled to qualified immunity because they did not violate clearly established law.

"To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Brown*, 574 F.3d at 496 (quoting *Henderson*, 439 F.3d at 502).

An official may be held liable under § 1983 only if the official, "through [his or her] own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). This court has said that "[i]n a § 1983 case an official is only liable for his own misconduct . . . ." *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 (8th Cir. 2012) (quoting *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534–35 (8th Cir. 2009)). "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (quoting *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006)). Thus, the detectives only violated the Fourth Amendment if their own actions were directly responsible for a deprivation of the plaintiff's rights. They are not automatically responsible for all of the actions of the SWAT team officers.

An officer's decision to authorize a SWAT team to execute a warrant can, in some cases, constitute a Fourth Amendment violation. *See Holland ex rel. Overdorff*

*v. Harrington*, 268 F.3d 1179, 1189–92 (10th Cir. 2001) (involving search and arrest warrants). It is clear the decision to send a SWAT team into a residence must be reasonable. *See id.*

We do not, however, decide whether the detectives' decision here was reasonable. On the one hand, they had no information that would have supported the need to send the SWAT team to execute the search warrant. They also performed virtually no investigation that would have provided them with more information about whether the use of the SWAT team was appropriate. But on the other hand, the detectives are only responsible for their own decisions. Importantly here, we must judge their conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. While the detectives likely knew the use of a flash-bang grenade was possible, no evidence suggests they directed or were involved in planning its use. The warrant was also not a "no-knock" warrant. Thus, the detectives would have expected the SWAT team officers to knock and announce their presence — and presumably not use a flash-bang grenade without justification. This is a much different situation from one where an officer is involved in the planning of a surprise, "no-knock" raid by a SWAT team and knows a significant amount of force will be used. The detectives would not have necessarily anticipated the SWAT team would throw a flash-bang grenade into the house blindly without knowing who was inside and without any indication that anyone inside posed any danger to them.

Without deciding the close question of whether the detectives' decision to use the SWAT team to execute the search warrant in this case violated the Fourth Amendment, we conclude the detectives did not violate clearly established law. Z.J. has pointed to no cases in this circuit, or a consensus of cases from other circuits, that would have put the detectives on notice that using a SWAT team to execute a search

warrant under these circumstances violated the Constitution. Nor was the decision obviously unconstitutional. The detectives are entitled to qualified immunity for what may have been a "bad guess[] in [a] gray area[]." *Scott*, 720 F.3d at 1036 (quoting *Davis*, 375 F.3d at 712).

## C. The Board

The Appellants argue the district court erred by denying the Board's motion for summary judgment. The district court concluded there was a genuine dispute of material fact "regarding whether there was a continuing, widespread, persistent pattern of routine use of the [flash-bang grenades] by the [SWAT] Team without any regard for the safety of the occupants of the residence," and "whether the Board was deliberately indifferent to or tacitly authorized this custom and whether this custom was responsible for plaintiff's injuries."

We conclude that we lack appellate jurisdiction to review the district court's denial of summary judgment to the Board. "Ordinarily, this court lacks jurisdiction over a denial of summary judgment 'because such an order is not a final decision.'" *Morgan v. Robinson*, 920 F.3d 521, 523 (8th Cir. 2019) (en banc) (quoting *Division of Emp't Sec. v. Board of Police Comm'rs*, 864 F.3d 974, 978 (8th Cir. 2017)). As discussed above, we have limited jurisdiction to review denials of summary judgment based on qualified immunity to the extent they turn on an issue of law. *See Mitchell*, 472 U.S. at 530. But the Board, as a municipal entity, is not protected by qualified immunity. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 393 (8th Cir. 2007). Thus, we lack appellate jurisdiction to review the denial of summary judgment to the Board.

Nor can we review the Board's appeal under pendent appellate jurisdiction. We may review certain claims to the extent they are "inextricably intertwined" with an issue we already have jurisdiction to review. *See Roberts v. City of Omaha*, 723 F.3d 966, 975 (8th Cir. 2013). In this context, we may review the denial of the Board's motion for summary judgment only to the extent our resolution of the claim against the SWAT team "necessarily resolves" the Board's liability. *See id.*; *Muir v. Decatur Cty.*, 917 F.3d 1050, 1054 (8th Cir. 2019).

To establish liability against a municipality for an unconstitutional custom, a plaintiff must show, among other things, "that [he or she] was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014); *see also Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–95 (1978). Our conclusion that the SWAT team violated the plaintiff's constitutional rights is relevant to the Board's liability, but it does not "necessarily resolve" it. Showing a constitutional violation is but one of several requirements to establish municipal liability. As a result, we do not have pendent appellate jurisdiction to review the district court's denial of the Board's summary judgment motion. We dismiss this portion of the appeal.

## III. Conclusion

We affirm the district court's denial of summary judgment as to the SWAT team, reverse as to the detectives, and dismiss the appeal as to the Board.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

While I agree with much of the court's analysis, I take issue with two points—that the use of the flash-bang grenade violated clearly established law and that the decision to authorize a SWAT team to execute a search warrant can constitute excessive force.

First, I disagree that the use of the flash-bang grenade violated clearly established law. Evaluating a claim of qualified immunity requires us to consider whether the violated constitutional right "was clearly established at the time of the defendant's alleged misconduct." *Winslow v. Smith*, 696 F.3d 716, 731 (8th Cir. 2012). Thus, we consider the law as it existed in November 2010, at the time of the search at issue here.

To avoid qualified immunity, Z.J. may present "a robust consensus of cases of persuasive authority." *De La Rosa v. White*, 852 F.3d 740, 745 (8th Cir. 2017). The court claims that "many other courts" have addressed the reasonableness of the use of flash-bang grenades, *ante*, at 14, but it cites opinions from only the Ninth and Seventh Circuits. Agreement between two other circuits does not constitute a robust consensus of cases of persuasive authority. While some additional circuits have found Fourth Amendment violations involving flash-bang grenades, their decisions came after November 2010. *See Dukes v. Deaton*, 852 F.3d 1035 (11th Cir. 2017); *Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014).

Additionally, the Eleventh Circuit held in 2017 that a July 2010 search involving a flash-bang grenade did not violate clearly established law. *Dukes*, 852 F.3d at 1044. In *Dukes*, after a SWAT team deployed two flash-bang grenades, an officer threw another flash-bang grenade "into a dark room in which the occupants

were asleep." *Id.* at 1040, 1042.  There was "minimal need" for the officer to throw the third flash-bang grenade, and he did not inspect the room for bystanders.  *Id.* at 1042.  Though, as the court notes, the SWAT team was searching a house at which a drug dealer who carried a handgun resided, the Eleventh Circuit explained that deploying a third flash-bang grenade was "gratuitous" despite the fact that "drug dealers are known to be violent."  *Id.* at 1042-43.  Citing Sixth, Seventh, and Ninth Circuit cases, the Eleventh Circuit determined that the officer violated the Fourth Amendment.  *Id.*

But the Eleventh Circuit also concluded that the officer did not violate clearly established law as it existed in 2010.  It pointed to *Boyd v. Benton Cty.*, 374 F.3d 773 (9th Cir. 2004), a decision upon which the court in this case relies.  *Ante*, at 14. Though the Ninth Circuit found in *Boyd* that throwing a flash-bang grenade into a room with up to eight people without first inspecting the room violated the Fourth amendment, it concluded that the right was not clearly established.  *Boyd*, 374 F.3d at 779, 784.  The Eleventh Circuit also considered *Bing ex rel. Bing v. City of Whitehall, Ohio*, 456 F.3d 555 (6th Cir. 2006).  In *Bing*, the Sixth Circuit similarly found that the 2002 use of a second flash-bang grenade violated the Fourth Amendment but that the right was not clearly established by the Supreme Court, the Sixth Circuit, or any other circuit.  456 F.3d at 570.  As evidenced by its citations to the Sixth, Seventh, and Ninth Circuits, the Eleventh Circuit in *Dukes* understood the law as it existed in 2010 but nevertheless concluded that it was not clearly established.  *Dukes*, 852 F.3d at 1044.

Though the court correctly notes that the Seventh Circuit held that the July 2005 use of a flash-bang grenade violated clearly established law, *Estate of Escobedo v. Bender*, 600 F.3d 770, 786 (7th Cir. 2010), the reasoning of the Sixth, Ninth, and Tenth circuits demonstrates that the law was not clearly established.  And *Bender*

considered the use of flash-bang grenades in the context of a seizure rather than a search, as here. *Id*. at 780. Determining the reasonableness of a search or seizure requires "weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (internal quotation marks omitted), and searches and seizures implicate different Fourth Amendment interests, *Segura v. United States*, 468 U.S. 796, 806 (1984). *See also Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 933 (8th Cir. 2016) (explaining that unreasonable seizure cases do not apply to unreasonable search cases because the "Search Clause of the Fourth Amendment is wholly distinct from the Seizure Clause, such that courts applying these clauses must understand they provide different protections against government conduct").

In sum, Z.J. has not shown a "robust consensus of cases" that resolve "a fact-intensive Fourth Amendment issue under a governing standard that requires judges to 'allow[] officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *De La Rosa* 852 F.3d at 747 (alteration in original). Further, *Dukes*, though different in some respects, illustrates that the law was not clearly established in Novermber 2010.

I similarly disagree that the use of the flash-bang grenade violated law clearly established by a "general constitutional rule" that applied "with obvious clarity." *See United States v. Lanier*, 520 U.S. 259, 271 (1997). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). We must ask whether the constitutional question was "beyond debate." *City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015). "This exacting

standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Id*. (alterations in original). As discussed above, the Sixth, Ninth, and Tenth Circuit opinions indicate that a "general constitutional rule" did not apply "with obvious clarity."

The facts of the case also demonstrate that a general constitutional rule did not apply with obvious clarity. Although we view the facts in the light most favorable to Z.J., we "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam). The record shows that the home's lights were turned on when Carla Brown opened the door, and Rusley could see to the "back wall" of the room from where he was positioned at the door. According to Brown, Rusley threw the flash-bang grenade over her head. Rusley testified that he was trained to throw flash-bang grenades away from people and that he threw the flash-bang grenade "approximately 20 feet" into the living room.

Rusley took reasonable precautions to minimize the flash-bang grenade's potential impact on bystanders. He threw the flash-bang grenade away from Brown when nobody else was visible in the living room, and the only way he could have inspected the living room more thoroughly was by entering. But the very purpose of using the flash-bang was to allow the SWAT team to enter the home with minimal risk of confrontation. *See L.A. Cty., Cal. v. Rettele*, 550 U.S. 609, 616 (2017) (per curiam) ("When officers execute a valid search warrant and act in a reasonable manner to protect themselves from harm, however, the Fourth Amendment is not violated.").

The court correctly notes that we must assume that Brown held up the keys to open the door for the SWAT team and that the SWAT team had already knocked and

announced its presence. *Ante*, at 12. It concludes that there was no need to use the flash-bang grenade because the occupants already knew, after the knock and announce, that the SWAT team was there. *Ante*, at 16-17. But though the occupants may have already known the SWAT team was at the door due to the knock and announce, a SWAT officer still could have reasonably believed—even though ultimately mistaken—that safety concerns necessitated an expedited entry by using a flash-bang grenade because, as Detective Robert Jorgenson noted, it was taking "longer than the normal amount of time to get into the residence." And even though the suspect was already in custody, the team was investigating a serious and violent crime—murder. I would thus conclude that the law was not clearly established in November 2010.

Second, the court's conclusion that the decision to authorize a SWAT team to execute a search warrant can constitute excessive force and therefore an unreasonable search is unnecessary. *Ante*, at 21-22. Thus, I only would decide, and agree with the court, that authorizing the SWAT team did not violate clearly established law. *See Fortunati v. Vermont*, 503 F. App'x 78, 81 (2d Cir. 2012) (declining to decide whether deploying a SWAT team can amount to a Fourth Amendment violation because the Second Circuit had not addressed the question and concluding instead that the right was not clearly established).

To be sure, the use of a SWAT team may involve a show of overwhelming force and may be unreasonable in a particular context, but whether the use of a SWAT team constitutes an unreasonable use of force necessarily depends on the SWAT team's actions in executing the warrant. An officer making the general decision to deploy a SWAT team may not be responsible for the tactical decisions the team makes in carrying out the search. Here, there is no evidence that the SWAT team always applies excessive force. *Cf. Mountain Pure*, 814 F.3d at 933 (noting that

-29-

none of the cases the appellant cited indicated "that the presence of armed officers, without more, is objectively unreasonable during the execution of a search warrant"). The mere decision to use a SWAT team does not "determine[] the degree of force initially to be applied in effecting the seizure itself." *Contra Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190 (10th Cir. 2001).

The Tenth Circuit's decision in *Holland* also involved whether the decision to use a SWAT team could constitute excessive force in executing a seizure rather than a search. The Eighth Circuit "scrutinize[s] only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993). Indeed, "[t]he Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." *Id*. Ultimately, as explained above, I would not decide this issue because it is not necessary to resolution of the case.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I join the court's opinion except for the latter half of Part II.B.2. The opinion acknowledges that an officer's decision to authorize a SWAT team to execute a search warrant can violate the Fourth Amendment under certain circumstances, yet it declines to opine on whether there was a constitutional violation here. The district court concluded that there are material factual disputes about whether the detectives violated Z.J.'s clearly established Fourth Amendment rights by failing to conduct an adequate investigation and by summoning a SWAT team without justification. I would affirm that conclusion for two reasons.

First, the detectives' brief investigation uncovered "no information" supporting the need for a SWAT team in this case. Supra at 22. The primary suspect, Charles,

was already in custody and available for questioning for several hours before detectives even contacted the SWAT team to assist with the search. No effort was made to interview him to determine whether he lived at the Bristol residence or whether the object of the search (the victim's cell phone) was located there. The detectives conducted virtually no surveillance on the Bristol residence to determine if there were other occupants present before asking the SWAT team to carry out the search. This contrasts with how the detectives conducted other searches in this case. Once detectives learned that Charles actually lived around the corner in the Winchester apartments, they immediately went to search for the phone at that location. Instead of using a SWAT team or uniformed officers, detectives simply approached Charles's residence and obtained consent to search. A year later, when it came time to search the residence of the actual culprit, the detectives again used uniformed officers instead of a SWAT team and performed the search only after informing a member of the suspect's family that a search was imminent.

Second, the district court concluded that there are genuine disputes of material fact regarding whether (1) the KCPD SWAT team has a continuing, widespread, and persistent pattern of routinely using flash-bang grenades without any regard for the safety of the occupants of a residence and (2) the Board is deliberately indifferent to this practice. The court's opinion nonetheless asserts that the detectives "would have expected" the SWAT team officers to operate within the confines of the Fourth Amendment when conducting a search. Supra at 22. But why would the detectives have that expectation if the evidence shows that KCPD's SWAT team routinely uses flash-bang grenades in reckless violation of the Constitution? The summary-judgment standard requires us to draw all reasonable inferences in favor of Z.J., not the other way around. Bradford v. Palmer, 855 F.3d 890, 892 (8th Cir. 2017).

Viewing the facts in the light most favorable to Z.J., a reasonable jury could conclude that using the SWAT team under these circumstances violated her clearly established Fourth Amendment rights. See Saucier v. Katz, 533 U.S. 194, 202 (2001). The bounds of the Fourth Amendment "may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (cleaned up). At the time of the search, multiple circuits had recognized that the unwarranted use of a SWAT team can violate the Constitution. See, e.g., Estate of Smith v. Marasco, 430 F.3d 140, 149 (3d Cir. 2005); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1190 (10th Cir. 2001).[6] This much should have been obvious to any reasonable detective, because a SWAT team is "an overwhelming show of force—force far greater than that normally applied in police encounters with citizens," making the decision to deploy a SWAT team "largely determin[ative]" of how the search will be conducted and "the extent of the intrusion on the individual's Fourth Amendment interests." Holland, 268 F.3d at 1190. Use of such force requires adequate justification. Cf. Muehler v. Mena, 544 U.S. 93, 108 (2005) (Stevens, J., concurring in the judgment) ("When officers undertake a dangerous assignment to

---

[6]Although Holland analyzed a seizure, not a search, I respectfully disagree with the suggestion that this makes the case inapplicable to the search context. See supra at 26–27, 30 (Gruender, J., concurring in part and dissenting in part). The quote in Mountain Pure traces back to Segura v. United States, 468 U.S. 796, 806 (1984), which recognized that searches and seizures of property implicate different interests: "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." Therefore, a seizure is usually "less intrusive" than a search and is more likely to be permissible absent a warrant. Id. This distinction has no relevance to excessive force cases, which are subject to the same analysis regardless of whether the case is about a search or a seizure. "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1546 (2017) (cleaned up).

execute a warrant to search property that is presumably occupied by violence-prone gang members, it may well be appropriate to use both overwhelming force and surprise in order to secure the premises as promptly as possible.").

Because there was no justification for calling a SWAT team and there is evidence that this particular SWAT team may have a widespread practice of using excessive force, I cannot conclude that the detectives were entitled to qualified immunity for their decision to employ the SWAT team in this case.

_____