# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2204

_____

Phillip Ransom

*Plaintiff - Appellee*

v.

Anthony Grisafe, both in his official and his individual capacity; John Randle,
both in his official and his individual capacity; Tyrone Phillips; Angela
Conaway-Dawdy, both in her official and her individual capacity; Thomas Dearing

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 13, 2015
Filed: June 22, 2015
[Published]

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

PER CURIAM.

Phillip Ransom sued Kansas City Police Officers Tyrone Phillips and Angela
Conaway-Dawdy, Kansas City Police Detectives Anthony Grisafe and Justin Randle,
and Kansas City Police Sergeant Thomas Dearing under 42 U.S.C. § 1983, alleging

that the defendants violated his rights under the Fourth and Fourteenth Amendments of the Constitution. The defendants moved for summary judgment and argued that they were entitled to qualified immunity. The district court concluded that there were disputed issues of material fact and denied the motion. The defendants appeal. We reverse and direct entry of judgment for the defendants.

## I. Background

The facts here are recited "in the light most favorable" to Ransom, giving him "the benefit of all reasonable inferences," because he is the non-moving party. Williams v. Holley, 764 F.3d 976, 979 (8th Cir. 2014) (quotation omitted).

It was a dark and rainy evening on November 11, 2010. Phillip Ransom was driving home from work in Lenexa, Kansas, to Kansas City, Missouri. Two miles before his exit, Ransom's van began backfiring, and he pulled over to the side of the road on Gregory Boulevard, near I-435. The sounds from his van alerted someone, who called 911 and reported that shots had been fired from or near a white van, though the caller did not report having seen flashes indicative of gunfire coming from the car. Officers Tyrone Phillips and Angela Conaway (now Conaway-Dawdy) responded to the call and drove their squad car toward the intersection.

What happened once Officers Phillips and Conaway arrived at the scene was recorded by the dashboard camera inside the officers' squad car. The district court did not discuss the video or the scene as recorded by the camera. But the video was available to the court and the parties, and neither party disputes the accuracy of the video or alleges that it has been altered in any way. Thus, we will "view[] the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 381 (2007).

The video shows the following: The officers pass by Ransom's van as they arrive at the scene. Officer Conaway says, "There's probably the van," which is

-2-

white, corroborating the call. The car pulls behind Ransom's van, which has on its hazard lights. Only seconds later, the van backfires. (If the viewer watches closely, sparks can be seen shooting out from the van's tailpipe; the tailpipe visibly shakes as it fires.) Just after the backfire, the driver's-side door of the van opens. Officer Phillips yells, "Get back in the car." Ransom appears not to hear Officer Phillips and steps out of the van. As soon as he does, the two officers fire a total of eight shots. Ransom does not react as if he has been hit by any shot,[1] nor does he appear to notice that the officers have fired at him. Instead, he briefly looks around and then down at the tailpipe of the van, shakes his head side-to-side, and turns and walks to the front of the van. The officers report "shots fired" into the radio. Moments later, Ransom raises his hands from the front of his van. Officer Phillips yells, "Lay on the ground." Ransom lowers his hands to the side of the van, but he stays in front of the vehicle. Only his hands are visible. Officer Phillips asks Ransom, "Where's it coming from?," to which Ransom replies, "My van is backfiring." Officer Phillips asks, "Your van is backfiring?" but then adds, "No, it's not. Our window's shot out!"[2] Officer Phillips then orders Ransom to turn around and walk toward the squad car. Ransom complies and walks backward, toward the squad car and out of sight of the camera.

Officer Phillips says to Officer Conaway, "That didn't sound like a backfire to me." Officer Conaway agrees. Officer Phillips says he heard "more than one. I heard, like, four." The Officers request back-up because they believe there may be another person there who had fired the shots, possibly from a ditch along the side of Gregory Boulevard. Officer Phillips asks Ransom if he has been shot; Ransom's response is inaudible. Ransom later tries to explain that the sound was from his van backfiring, but Officer Phillips says, "No, that was a gunshot." The officers tell

---

[1]The parties stipulate that none of the bullets fired by Officers Phillips and Conaway struck Ransom.

[2]As was later determined, the broken window and bullet holes found in the squad car were caused by the ricocheting bullets fired from the officers' own guns.

Ransom they received a call about shots being fired and ask why he was getting out of his car. He explains that he thought his van was catching fire. Numerous other officers arrive and close off the area to the public. Near the end of the video, Officer Phillips can be heard telling another officer that he was sure he heard the sound of a gunshot, not a backfire, and that he heard it more than once.

In December 2012, Ransom filed a lawsuit in state court against the two officers who were at the scene, two detectives who later investigated the "shooting," and a Kansas City sergeant. The defendants removed the action to federal court, and in September 2013, Ransom filed a second amended complaint, raising claims under 42 U.S.C. § 1983. Ransom alleges that the defendants seized him at the scene and detained him for a total of four hours, including for "at least 34 minutes and 29 seconds" at the Kansas City Police Department. He says he was not "free to go" until told so by one of the detectives at the police department. He claims excessive force was used against him, that he was unreasonably seized, and that he was deprived of his liberty and held against his will without probable cause.

During discovery, various witnesses were deposed. Ransom testified that he saw the officers U-turn and pull behind him; at that time, his van still was backfiring. Ransom did not dispute the officers' belief that they heard multiple backfires, and he agreed that the sound of the backfires could easily be mistaken for gunshots. He did not realize, however, that the officers fired shots at him; instead, he thought their shots were the sound of his van backfiring. He testified, however, that a piece of what he "assumed . . . was glass . . . grazed the side of my head," but he was not bleeding from it. When Ransom saw Officer Conaway with her weapon drawn, he put up his hands. He also noticed at that time that the squad car was "shot up" and that a window had been shot out.

About five minutes after he was handcuffed, Ransom testified, he was taken to a police wagon that arrived. He had no further contact with Officers Phillips and

-4-

Conaway. He eventually talked with Detectives Randle and Grisafe, who were there to investigate the shooting. Ransom heard someone say to take Ransom out of the van "and make him as comfortable as possible." That person, he later found out, was Sergeant Dearing, but Ransom testified that he had no personal interaction with the sergeant. Ransom asked if he could go home, but Detective Randle told him he was "going downtown" for questioning.

Ransom testified that he then was taken to the police headquarters. He was not handcuffed or put in the back seat of a patrol car, and he was allowed to bring his cell phone and call his wife. Ransom was not booked or fingerprinted, but he was put into a room that he assumed was locked because he heard it latch; no one told him it was locked. He signed a sheet detailing the Miranda warnings and agreed to talk without a lawyer present. He testified that no one yelled or cursed at him or otherwise threatened him during the interview.[3] The interview ended when Detective Randle told Ransom he was "free to go." The police offered him a ride home, which he accepted.

Officers Phillips and Conaway testified that when they pulled behind the van, they began to exit their car when they heard a loud backfire that they thought was a gunshot. The officers believed that they were being "ambushed": They thought the scene was "a setup to draw officers to the scene to kill us." When Ransom did not follow Officer Phillips's command to get back in his car, Officer Phillips believed

_____

[3]The district court added that, during the interview, the detectives had a sketch made of Ransom's face; questioned him about his family; and asked whether he "was a 'member of a gang[,]' whether he had any 'gold in his mouth[,]' and whether he was missing any teeth, etc." The court cites to a video of the interview at the police headquarters, but that video was not made a part of the record on appeal. Because neither party contests these facts as recited by the district court, we will accept the court's recitation on this point. See United States v. Howard, 532 F.3d 755, 757 n.3 (8th Cir. 2008).

that Ransom was "suicidal by the cop," was "not trying to flee," and was "ready to die." He feared for the safety of himself, Officer Conaway, and any bystanders. The officers thought they heard more shots, so they fired at Ransom. Neither officer was able to see Ransom's hands when he exited his van or went to the front of it.

Detective Randle testified that, as far as he knew, the officers had driven to the van following the report of shots being fired; shots were fired at them from the van when they arrived; and they returned fire. Detective Randle testified that he was instructed by Sergeant Dearing to take Ransom downtown for questioning. Detective Randle added that, although Ransom was detained while he was questioned, he was not "in custody."

Sergeant Dearing testified that when he arrived at the scene, Ransom was in handcuffs. As time went by, Sergeant Dearing said, he "started to determine what had happened at the crime scene . . . and it didn't look like we had probable cause to arrest him" because "there was no weapon." Sergeant Dearing noted that the investigation had determined Ransom's van was backfiring and that there was no suspect in the field nearby; thus, Sergeant Dearing concluded "that we didn't have probable cause" and instructed officers to take Ransom "out of the [police] wagon and out of handcuffs." After that point, Sergeant Dearing no longer believed the officers even had a reasonable suspicion to hold Ransom. After the detectives had interviewed Ransom at the scene, however, Sergeant Dearing instructed them to get a statement from Ransom at the police headquarters. According to Sergeant Dearing, it is "standard practice[,] . . . if they are willing to go," to take witnesses to officer-involved shootings downtown at the time of the shooting to give a statement.

After discovery had concluded, the defendants moved for summary judgment, arguing that the officers had qualified immunity from suit based on "their reasonable misapprehension of the facts." They also argued that the detectives had probable cause to detain Ransom briefly for questioning and to take him to the police

headquarters. The defendants alternatively argued that Ransom had consented to giving a statement.

The district court denied the motion. The court reviewed Ransom's testimony that "a bullet or glass . . . grazed the side of my head" and that the officers ordered him to the ground, to show his hands, and to walk to the police car and then handcuffed him. Based on that testimony, the court concluded that a question of fact exists regarding whether Ransom was "seized" by the bullets fired at him and the officers' actions. The court also concluded that "there are disputed issues of fact which preclude the granting of qualified immunity" for the officers. Nor was qualified immunity appropriate for Detectives Randle and Grisafe or Sergeant Dearing, the court concluded, because there are genuine issues of fact "regarding whether probable cause existed to detain plaintiff and whether plaintiff gave consent to be taken downtown and questioned."

## II. Discussion

Although an appeal from the denial of summary judgment is interlocutory in nature, we have jurisdiction to review that order but only to the extent that the denial "turns on an issue of law." Robbins v. Becker, 715 F.3d 691, 693 (8th Cir. 2013) (quotation omitted). Thus, in this interlocutory appeal we may review only the legal issues regarding the district court's application of qualified immunity to the facts in this case. Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012). But we will not, and indeed may not, "resolve any disputed issues of evidentiary sufficiency." Id. (quotation omitted). With respect to the legal issue—the denial of qualified immunity—our review is *de novo*. Gladden v. Richbourg, 759 F.3d 960, 964 (8th Cir. 2014).

### a. Officers Phillips and Conaway

On appeal, the defendants first argue that Officers Phillips and Conaway did not seize Ransom when they fired at him because their gunshots did not "arrest his movement." He was not seized, they insist, until he noticed the officers and put up his hands. Even then, the defendants assert, the seizure was objectively reasonable based on their belief that he was ambushing them. Because they acted reasonably, the defendants conclude, they are entitled to qualified immunity.

Qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). This immunity applies to discretionary functions of government actors, including the decision to use deadly force, see Loch v. City of Litchfield, 689 F.3d 961, 967 (8th Cir. 2012), and to detain an individual, see Hart v. United States, 630 F.3d 1085, 1090 (8th Cir. 2011) (discussing federal officers). To overcome the defense of qualified immunity, Ransom must have shown that the officers' actions violated a constitutional right that was "clearly established" at the time of their alleged misconduct. Pearson, 555 U.S. at 232. In other words, the officers must have been "plainly incompetent" or must have "knowingly violate[d] the law" when they shot at him and seized him at the scene. See Gladden, 759 F.3d at 964 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). We evaluate the defense of qualified immunity "from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation." Id.; see also Anderson v. Creighton, 483 U.S. 635, 638 (1987) (noting that officers are shielded from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated").

The officers allegedly violated Ransom's right to be free from unreasonable seizures, granted by the Fourth Amendment, when they (1) fired their guns at him and (2) ordered him to lay on the ground, show the officers his hands, and walk toward them. We will address each set of actions.

### i. *The gunshots*

As Ransom testified and stipulated, and as corroborated by the video, he was not hit by any bullet. In the video, Ransom does not even seem to notice the shots; indeed, he testified that he thought the sounds of the gunshots were his van backfiring. The defendants argue that Ransom did not cease his movement as a result of the gunshots, and so those shots did not "seize" him under the Fourth Amendment. Ransom counters that although he was not directly hit, a bullet or a piece of glass may have grazed his head and thus "seized" him temporarily.

Construing the facts in the light most favorable to Ransom, he arguably was seized by a grazing shot or piece of glass. Nonetheless, we conclude that any seizure that did occur was justified. The use of deadly force is a seizure under the Fourth Amendment. Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005). But that seizure may be reasonable if the use of force was justified; that is, if "'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" Hassan v. City of Minneapolis, Minn., 489 F.3d 914, 919 (8th Cir. 2007) (quoting Brosseau v. Haugen, 543 U.S. 194, 197–98 (2004)).

It is undisputed that the officers knew a 911 call had reported shots fired, and that call was corroborated when the officers found Ransom's van where the caller said it would be. After arriving, the van backfired—a sound both sides agree could have been mistaken for a gunshot. Ransom then exited his van and appeared to the officers to disregard their order to get back in the car. Based on these facts, the officers were justified in using deadly force to neutralize what they reasonably

-9-

believed was a risk of serious physical harm, either to themselves or to others. It is very fortunate that the officers missed with their shots. This would be a tragic case if Ransom, who by all means was abiding by the law, had been injured or killed. Though Ransom had done nothing wrong, and viewing the scene in his favor, the officers' fear of harm was reasonable, and the potential seizure from their gunshots did not violate Ransom's Fourth Amendment rights.

### ii. The commands and subsequent handcuffing

When Ransom finally noticed the officers, he put up his hands and followed their commands. He yelled to the officers that he had no gun and that his van was backfiring, but the officers noticed that their window had been shot out and perceived the explanation as a sham. They ordered Ransom toward them and, when he reached the police car, ordered him to the ground and handcuffed him.

The defendants conceded at oral argument that the officers seized Ransom when they ordered him to put up his hands and walk toward them and subsequently handcuffed him. Thus, we need only ask whether that seizure was reasonable. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989); see Aippersach v. McInerney, 766 F.3d 803, 806 (8th Cir. 2014). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397.

Based on the undisputed facts in this case, we conclude that the officers acted reasonably when they seized Ransom. Only seconds after arriving at the scene where shots reportedly had been fired, the officers heard what both parties agree sounded like a gunshot. Although the sound actually was the backfiring of Ransom's van, it is not unreasonable that the officers at the scene would not notice the tailpipe

-10-

shooting sparks or realize that the sound they heard was from the van and not a gun. See Graham, 490 U.S. at 396 (proper test of reasonableness under Fourth Amendment "requires careful attention to the facts and circumstances of each particular case"). After firing at Ransom, the officers saw that their window was shot out (even though that was from their own ricocheting bullets). Although Ransom yelled that he had no gun and that the sounds were coming from his van, a reasonable officer in this position could not know whether Ransom's uncorroborated explanation was true. See Loch, 689 F.3d at 966–67 (officers acted reasonably in raising guns at suspect because, even though witnesses yelled he was unarmed, officers were told he had a gun and did not see him toss it away).

We believe the above facts provided the officers "an objectively reasonable concern for [their] safety or suspicion of danger" that allowed them to handcuff and detain Ransom while they surveyed the scene for future danger. Williams v. Decker, 767 F.3d 734, 741 (8th Cir. 2014); see United States v. Sokolow, 490 U.S. 1, 7 (1989) (affirming that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion [of ongoing criminal activity] . . . even if the officer lacks probable cause"). Though Ransom actually posed no danger, our review is only for *objective* reasonableness based on the circumstances at the time. See Williams, 767 F.3d at 741.

Considering the circumstances of the shooting, we conclude that the officers' seizure of Ransom was reasonable and did not violate his rights under the Fourth

Amendment.[4]   Thus, Officers Phillips and Conaway are entitled to qualified immunity.

### b.    Detectives Randle and Grisafe

Detectives Randle and Grisafe argue that they are entitled to qualified immunity, because even assuming that Ransom was seized and required to travel to police headquarters for an interview, the officers had "arguable probable cause" to detain him for questioning.  The district court, in denying their motion for summary judgment, concluded that "there are genuine issues of fact regarding whether probable cause existed to detain plaintiff."

The officers are entitled to qualified immunity if there was "arguable probable cause" to detain Ransom when they transported him to police headquarters for questioning.  That is, the officers are immune from suit if they had "a mistaken but objectively reasonable belief" that Ransom had committed a criminal offense. McCabe v. Parker, 608 F.3d 1068, 1078 (8th Cir. 2010).  "When an officer is faced with conflicting information that cannot be immediately resolved, . . . he may have arguable probable cause to arrest a suspect."  Borgman v. Kedley, 646 F.3d 518, 523 (8th Cir. 2011).

When Randle and Grisafe arrived on the scene, they were briefed by Sergeant Dearing.  Dearing told them that other officers (i.e., Conaway and Phillips) had been dispatched in response to a report of shots fired from a white van, that shots were

---

[4]Because we conclude that the officers did not violate Ransom's constitutional rights, we need not address whether the right allegedly violated was "clearly established" at the time of the events.  See Pearson, 555 U.S. at 236 (granting courts discretion to decide which element of qualified immunity to address first); Fields v. Abbott, 652 F.3d 886, 894 (8th Cir. 2011) (passing on question whether right was clearly established after concluding that no constitutional right was violated ).

fired from the van when the officers arrived, and that the officers returned fire. The officers, he said, "felt like they were being shot upon somewhere in the field." Grisafe interviewed Officer Conaway, who was an eyewitness to the incident. Conaway told Grisafe that when she and Phillips arrived at the scene, they heard a gunshot, and "Officer Conaway believed that Mr. Ransom was shooting at her partner, Officer Phillips." Randle canvassed the area; the police cruiser driven by Conaway and Phillips had been damaged by gunfire.

The information conveyed to Grisafe by eyewitness Conaway—that Ransom was shooting at Officer Phillips—and the corroborating evidence of damage to the police cruiser was enough to establish at least arguable probable cause for Grisafe and Randle to detain Ransom for questioning. "The officers had no duty to conduct further investigation once they had (arguable) probable cause to arrest." Clayborn v. Struebing, 734 F.3d 807, 809 (8th Cir. 2013).

In denying qualified immunity, the district court relied heavily on the fact that Sergeant Dearing believed there was no probable cause to arrest Ransom by the time Randle and Grisafe took Ransom to headquarters. The record is not clear whether Dearing communicated his belief to Randle and Grisafe. Dearing testified that he told "them" to take Ransom out of the police wagon and out of handcuffs; he said he did not remember whom he told, but that it "was probably one of my detectives." Dearing said that he directed that Ransom be released because as the investigation progressed, "it didn't look like we had probable cause to arrest him." At some point, Dearing said that one of the detectives—"it may have been Randle"—told him that Ransom was cooperative, and Dearing told Randle, "well, let's get a statement from him." Randle and Grisafe thereafter brought Ransom to headquarters for an interview.

In determining whether Randle and Grisafe had arguable probable cause to detain Ransom, the standard is objective. Dearing's *subjective* belief about the

-13-

existence of probable cause, even assuming it was conveyed to Randle and Grisafe, is not relevant to the analysis. Bridgewater v. Caples, 23 F.3d 1447, 1449 (8th Cir. 1994). Changes in *objective* evidence may be relevant: "an investigative stop must cease once reasonable suspicion or probable cause dissipates." United States v. Watts, 7 F.3d 122, 126 (8th Cir. 1993). But whether probable cause dissipated requires examination of the objective facts known to the detaining officers. There is no evidence that Dearing communicated to Randle and Grisafe whatever factual information led Dearing to conclude that Ransom should be released from the police wagon and handcuffs. The record thus does not support a finding that when Randle and Grisafe brought Ransom to police headquarters, the officers were aware of facts about the incident that eliminated arguable probable cause to detain Ransom based on Officer Conaway's eyewitness report that Ransom was shooting at Officer Phillips.

For these reasons, we conclude that Randle and Grisafe had at least arguable probable cause to detain Ransom when they drove him to police headquarters for an interview. The officers are entitled to qualified immunity.

### c.    Sergeant Dearing

Last, the defendants argue that Sergeant Dearing did not seize Ransom because he "ordered Mr. Ransom to be taken out of, not into, custody." Additionally, the defendants assert, Sergeant Dearing had no contact with Ransom and no knowledge whether Ransom agreed to go downtown for questioning or, instead, had asked to go home. Thus, the defendants conclude, Sergeant Dearing should be entitled to qualified immunity against the wrongful-detention claim.

On this point, and based on the evidence in the record, we agree with the defendants. Though Sergeant Dearing did tell the detectives to get a statement from Ransom, he was told that Ransom was "very cooperative." Sergeant Dearing

-14-

followed the standard practice of getting a statement from witnesses of officer-involved shootings, "if they are willing to go." Sergeant Dearing was never informed that Ransom had told the detectives he wanted to go home and did not consent to the interview at police headquarters. Even assuming for the sake of analysis that the detectives detained Ransom against his will without probable cause, Sergeant Dearing is not liable for the unauthorized, unconstitutional actions of others. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Parrish v. Ball, 594 F.3d 993, 1001-02 (8th Cir. 2010). Nor can we conclude that Sergeant Dearing intentionally violated Ransom's Fourth Amendment right to be free of unreasonable seizures; he is thus entitled to qualified immunity. See McCoy v. City of Monticello, 342 F.3d 842, 847 (8th Cir. 2003) ("To be a violation of the Fourth Amendment, the restraint in liberty must be effectuated '*through means intentionally applied.*'") (quoting Brower v. County of Inyo, 489 U.S. 593, 597 (1989)).

## III. Conclusion

For the foregoing reasons, we reverse the district court's order denying qualified immunity to the police officers, and we remand with directions to enter judgment for the defendants and dismiss the complaint.

RILEY, Chief Judge, concurring.

I fully join the majority opinion but write separately to reiterate the court's direction in Robbins v. Becker, 715 F.3d 691 (8th Cir. 2013), and other cases, that district courts must carefully conduct "a thorough qualified immunity analysis" before denying or granting summary judgment on this issue, including "findings of fact and conclusions of law, similar by analogy to [Federal Rule of Civil Procedure] 52(a)(2)," sufficient for our court effectively to "fulfill our function of review." Id. at 694 & n.2 (quotations omitted). To be thorough, the determination may not be "'abbreviated'" or "'terse'" and must lay out the fact findings and law "'step-by-step.'" Jones v.

McNeese, 675 F.3d 1158, 1163 (8th Cir. 2012) (quoting O'Neil v. City of Iowa City, Iowa, 496 F.3d 915, 918 (8th Cir. 2007)).

KELLY, Circuit Judge, concurring in part and dissenting in part.

The court concludes that Detectives Randle and Grisafe are entitled to qualified immunity. It reaches that decision after relating the facts as presented by only the detectives and Sergeant Dearing. But our review of this summary judgment case is very limited in scope. We may review only the legal issue presented—whether the Detectives are entitled to qualified immunity—and that legal issue must be "considered on facts favorable to [the plaintiff]." McNeese, 675 F.3d at 1161; see Bridgewater, 23 F.3d at 1449 (noting that, on appeal from summary judgment, this court must view the evidence "in the light most favorable to the plaintiff"). Under that review, viewing the facts in Ransom's favor, I would conclude that Detectives Randle and Grisafe violated Ransom's constitutional rights and thus are not entitled to qualified immunity.

As the court acknowledges, Sergeant Dearing testified that he had told "probably one of [the] detectives" to take off Ransom's handcuffs because "it didn't look like we had probable cause to arrest him." In fact, Sergeant Dearing testified that when he ordered Ransom released from the wagon and the handcuffs, he no longer believed the officers had even a reasonable suspicion of wrongdoing. Yet, despite the instruction to release Ransom, Sergeant Dearing also told Detective Randle to get a statement from Ransom. Though there is no evidence in the record that either detective was expressly informed that there was no probable cause to arrest Ransom, neither were they told that there remained any justification to hold him.

Additionally, Ransom testified that he asked Detective Randle if he could go home. Detective Randle denied Ransom's request and responded that Ransom instead had to go downtown for questioning. Ransom was not booked or arrested, but

-16-

he was placed in what he believed to be a locked interview room for over 34 minutes while the detectives questioned him. The detectives asked Ransom about his family, whether he had "gold in his mouth," whether he was missing any teeth, whether he was in a gang, and so on. He also was listed as a "Suspect" in an "Aggravated Assault," not as a witness to an officer-involved shooting. After the questioning, they told him he was "free to go."

Though the detainment was investigative in nature, and not custodial, Ransom had a right not to be subject to detainment against his will. See Hayes v. Florida, 470 U.S. 811, 816 (1985) (concluding that police may not, "without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes").[5] Viewing the evidence in Ransom's favor, I conclude that the Detectives did detain Ransom against his will without probable cause to do so in violation of his constitutional right as described in Hayes. As a result, I believe the district court properly denied Detectives Randle and Grisafe's motion for summary judgment based on qualified immunity, and I respectfully dissent from the court's conclusion to the contrary in Part II(b).

Under the same standard of review, however, I agree that Officers Phillips and Conaway and Sergeant Dearing are entitled to qualified immunity. I also acknowledge this odd result: The officers who open-fired on an unarmed man are given immunity; yet the detectives who transported the same unarmed man, without restraint, to a police station to ask him questions and then took him home would receive no immunity. But the peculiarity of the facts in this case leads to those conclusions. All involved parties agreed that the van's backfires sounded like gunshots. The 911 caller certainly thought so, too. It was reasonable for the officers

_____

[5]The parties do not dispute that this right is "clearly established" for purposes of qualified immunity.

-17-

to react as officers would be expected to react in the highly unusual and potentially dangerous situation presented in this case. How lucky that the officers did not hit Ransom, or anyone else, when they fired their guns. But even viewing the facts in Ransom's favor, and despite the frightening circumstances, the officers are immune under the law from this suit. Thus, I concur in the court's conclusion in Part II(a). I concur in Part II(c), as well.

_____