# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-3092

_____

Johnny Banks

*Plaintiff - Appellee*

v.

Shelby Hawkins

*Defendant - Appellant*

City of Shannon Hills

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 22, 2020
Filed: May 27, 2021

_____

Before KELLY, WOLLMAN, and STRAS, Circuit Judges.

_____

KELLY, Circuit Judge.

In February 2017, police officer Shelby Hawkins, of the Shannon Hills Police Department in Arkansas, shot Johnny Banks in the course of investigating a potential domestic disturbance. Banks sued under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments. The district court[1] denied Hawkins's motion for summary judgment on Banks's excessive force claim, finding that genuine issues of material fact precluded a grant of qualified immunity, and this interlocutory appeal followed. We affirm.

## I.

Shortly before 10 p.m. on February 17, 2017, Vanessa Banks called 911 during an argument with her husband, Johnny Banks. Hearing a man and woman arguing—but "nothing" to indicate "that anything physical had happened"—the 911 operator dispatched Hawkins to investigate a potential domestic disturbance at the Banks residence. When Hawkins arrived on the scene, he saw a vehicle with its hazard lights flashing parked in the driveway. He called for backup and, as he approached the home, he heard a woman inside say in a muffled voice, "no, no, no." He knocked on the front door and announced his presence, but no one answered, so he walked around the house to hear what was going on inside. From the yard, he heard a "loud" noise near the back of the house that he later testified was "not a voice"—but he could not otherwise make it out. After about 10 minutes, Hawkins approached the front door a second time. He drew his gun and started kicking the door, at which point he heard someone inside say "who the f*** is this?" Hawkins did not answer. Then, several things happened: Johnny Banks opened the door,

---

[1]The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

Hawkins was hit on the head by an unknown object, and Hawkins shot Banks.[2]  It is undisputed that Johnny Banks was unarmed and did not hit Hawkins or throw anything at him.[3]

Banks survived the shooting, though the bullet severed a nerve in his leg and clipped his femoral artery.  He filed this lawsuit in February 2018 against Hawkins and the City of Shannon Hills, and the parties eventually filed cross-motions for summary judgment.  In September 2019, as pertinent here, the district court denied Hawkins's motion as to Banks's claim of excessive force on the basis of qualified immunity.[4]  Hawkins now appeals.

## II.

In determining whether qualified immunity applies to shield Hawkins from liability under § 1983, "we ask whether '(1) the evidence, viewed in the light most favorable to [Banks], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable offic[er] would have known that his actions were unlawful.'"  Cole ex rel. Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir. 2020) (quoting Rudley v. Little Rock Police Dep't, 935 F.3d 651, 653 (8th Cir. 2019)).

---

[2]We will sometimes refer to Johnny Banks by his last name; but to avoid any confusion, we will refer to Vanessa Banks only by her full name.

[3]There is nothing in the record to suggest that anyone threw an object at Hawkins.  Though it is inconclusive, the record contains references to a metal sign that was hanging on or above the door that may have hit Hawkins when the door swung open.

[4]The district court also granted Hawkins's motion for summary judgment on Banks's equal protection, negligent hiring, failure to train, and ratification claims, and denied Banks's motion in its entirety.  These decisions are not at issue in this appeal.

-3-

We review the district court's denial of summary judgment de novo, viewing the evidence in the light most favorable to Johnny Banks and giving him the benefit of all reasonable inferences. Edwards v. Byrd, 750 F.3d 728, 731 (8th Cir. 2014). On interlocutory appeal from a denial of qualified immunity, though, "we are constrained by the version of the facts that the district court assumed or likely assumed in reaching its decision." Thompson v. Murray, 800 F.3d 979, 983 (8th Cir. 2015). Unless that version of the facts is "blatantly contradicted by the record," "our jurisdiction is limited to resolving abstract questions of law related to the qualified-immunity determination"—that is, the purely legal questions of "whether a dispute identified by the district court is material" and "whether the allegedly infringed federal right was clearly established." Id. at 982-83; see also id. at 983 (noting that "[w]e lack jurisdiction to review the district court's determination regarding evidence sufficiency—i.e., what facts a party may or may not be able to prove at trial" (citing Johnson v. Jones, 515 U.S. 304, 313 (1995))); K.W.P. v. Kan. City Pub. Schs., 931 F.3d 813, 821 (8th Cir. 2019) (explaining that the denial of qualified immunity is immediately appealable if the disputed facts are not material to the legal question).

In this case, Hawkins first argues that the factual disputes found by the district court are immaterial and, in the alternative, that they are "blatantly contradicted by the record." Second, he argues that Banks's right to be free from excessive force was not clearly established at the time and under the particular circumstances of this case. We disagree.

## A.

To determine whether Hawkins used excessive force in violation of the Fourth Amendment, we "ask[] 'whether the amount of force used was objectively reasonable under the particular circumstances.'" Hutchins, 959 F.3d at 1132 (quoting Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs, 931 F.3d 672, 681 (8th Cir. 2019)). We evaluate what is objectively reasonable "from the perspective of a reasonable officer on the scene," which "turns on those facts known to the officer at the precise moment

he effectuated the seizure." Id. (cleaned up); see also id. ("A police officer's use of deadly force against a suspect is a 'seizure' under the Fourth Amendment."). Though we generally consider the totality of the circumstances, it is well-established that "'absent probable cause' for an officer to believe the suspect poses 'an immediate threat of death or serious bodily injury' to others, 'use of deadly force is not objectively reasonable.'" Id. (quoting Billingsley v. City of Omaha, 277 F.3d 990, 993 (8th Cir. 2002)). Where the record does not conclusively establish the lawfulness of an officer's use of force, summary judgment on the basis of qualified immunity is inappropriate. Nance v. Sammis, 586 F.3d 604, 612-13 (8th Cir. 2009).

Hawkins contends he was justified in shooting Johnny Banks because a reasonable officer in the same circumstances would have believed that Vanessa Banks was in "imminent danger." On this issue, the district court found that the "state of affairs" outside the residence, including whether Hawkins heard screams coming from inside, constituted a material factual dispute—that is, a dispute that is "outcome determinative." See Mosley v. City of Northwoods, 415 F.3d 908, 910-11 (8th Cir. 2005). Vanessa Banks called 911 at approximately 9:20 p.m. and Hawkins arrived at the house at 9:26 p.m. Hawkins called for backup at around 9:27 p.m. When the Arkansas State Police later interviewed Hawkins as part of a criminal investigation into the shooting, he told them that both before and after he called for backup, he heard "blood curdling screams" from a woman inside. He said he heard a muffled "no, no, no" after that.

But Vanessa Banks's deposition testimony contradicts Hawkins's account. She testified that she stopped yelling and arguing with her husband about five minutes after calling 911—meaning around 9:25 p.m.—once she heard the police radio outside. After that, she "just sat there" because she knew the police had arrived and there was "no point" in continuing. On this record, a jury could credit her testimony and question why—if the situation really was volatile—Hawkins waited 10 minutes after hearing screams to attempt entry. Resolving these factual disputes in Banks's favor, there was no reason to think that someone in the house was in imminent danger,

especially considering that Hawkins never saw anyone commit a crime. Cf. Johnson v. City of Minneapolis, 901 F.3d 963, 969 (8th Cir. 2018) (explaining that "one factor which cut[] decisively against arguable probable cause" was that the officer "did not observe [the suspect] committing a criminal act—and nobody told him that [she] did either").

In any event, we evaluate the reasonableness of Hawkins's conduct by looking primarily at the threat present *at the time* he deployed the deadly force. See Gardner v. Buerger, 82 F.3d 248, 253 (8th Cir. 1996) ("[W]e focus on the seizure itself—here, the shooting—and not on the events leading up to it."). Hawkins testified that he did not hear screaming, muffled words, or any other concerning noise around the time he started kicking Banks's front door. So even assuming the situation was dangerous when Vanessa Banks called 911, Hawkins had no reason to believe that was still the case. See Hutchins, 959 F.3d at 1134 (explaining that even "a few seconds is enough time to determine an immediate threat has passed," thus "extinguishing a[ny] preexisting justification for the use of deadly force"). What's more, both Johnny and Vanessa Banks testified that Hawkins fired his gun the moment Johnny Banks opened the door; and Hawkins himself said that he could not see where Vanessa Banks was when he pulled the trigger. If Hawkins was unable to ascertain Vanessa Banks's position relative to the line of fire, he was not acting to protect her. See Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005) ("[T]he facts we are required to assume show that [the officer] fired the shotgun in circumstances in which he knew or should have known that he would hit both Craighead and Scott, so he cannot have fired . . . to protect Scott."). Construing the disputed record in Johnny Banks's favor, a jury could conclude that no reasonable officer would have thought deadly force was necessary in that moment to protect Vanessa Banks from imminent danger. See Montoya v. City of Flandreau, 669 F.3d 867, 872 (8th Cir. 2012) ("While a jury may credit [the officer's] characterization of the incident and disbelieve [the plaintiff] at trial, it is not our function to remove the credibility assessment from the jury." (cleaned up)).

Similarly, though Hawkins claims he felt threatened by Johnny Banks's "aggressive composure" and thought he was "being attacked," we agree with the district court that Banks's demeanor and conduct are in dispute. For his part, Hawkins avers that when the front door swung open, Banks was charging toward him with his hand raised. According to Vanessa Banks, however, Johnny Banks did not move or cross the threshold of the doorway before Hawkins shot him. On these facts, even if Hawkins believed Johnny Banks was about to attack him, that belief was unreasonable. See Ribbey v. Cox, 222 F.3d 1040, 1043 (8th Cir. 2000) (affirming denial of qualified immunity where "a genuine question of fact exist[ed] regarding whether [the officer] had probable cause to believe that [the suspect], who . . . was turning reflexively down and away from the breaking window, was reaching for a weapon, and thus posed a significant threat of death or serious physical harm").

Indeed, though Hawkins asserts that he "shot Banks out of fear for his safety," the district court highlighted Banks's account that "all he did was open the door and . . . Hawkins instantaneously shot him." Hawkins fails to explain how this finding is contradicted by the record, or why it would be immaterial. It was "almost like [the] door was booby-trapped," Vanessa Banks testified, because Hawkins "literally . . . just shot" the instant it opened, suggesting Hawkins did not even take the time to ascertain Banks's demeanor before shooting him.[5] We recognize that officers often have to make "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances. Graham v. Connor, 490 U.S. 386, 397 (1989). But here, the facts indicate that Hawkins fired either (1) instinctively, without a warning or even a "split-second" pause to assess the situation, or (2) after ascertaining that Johnny Banks was

---

[5]Hawkins contends he shouted "stop!" right before shooting, but the Bankses dispute that account, too, and Hawkins himself failed to mention it in his statement to the Shannon Hills Police Department. Viewing the facts in Banks's favor, we have to assume that a warning was feasible and that Hawkins nevertheless failed to give it, which "exacerbate[s] the circumstances and militates against finding use of deadly force objectively reasonable." Hutchins, 959 F.3d at 1133 (cleaned up) (quoting Ludwig v. Anderson, 54 F.3d 465, 474 (8th Cir. 1995)).

not acting in an aggressive or threatening manner. Neither course of conduct is objectively reasonable under the Fourth Amendment. See Ludwig, 54 F.3d at 473 (reversing grant of qualified immunity where "material questions of fact remain[ed] as to whether [the suspect's] actions at the time of the shooting, even if dangerous, threatening, or aggressive, posed a threat of serious physical harm" (cleaned up)). After all, "[q]ualified immunity does not protect 'the plainly incompetent.'" Bell v. Neukirch, 979 F.3d 594, 609 (8th Cir. 2020) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Moreover, to the extent Hawkins contends he felt threatened because he was struck in the head by an unknown object, there is nothing in the record to suggest that the injury was attributable to Banks. Hawkins repeatedly stated in his deposition that he knew—at the time of the incident—that whatever struck him could not have come from Banks, or, at minimum, that he had no reason to believe that it did. This is consistent with other evidence in the record. Based on all the deposition testimony, it is undisputed that (1) Banks remained in front of Hawkins for the duration of the encounter, (2) Hawkins did not see Banks holding a weapon or any other object when the door opened, and (3) Banks never swung at or touched Hawkins. A reasonable officer in Hawkins's shoes would not have believed he was under attack by Johnny Banks—regardless of how rapidly the situation unfolded. See Johnson v. City of Minneapolis, 901 F.3d at 967 (concluding, despite the "charged scene" and the suspect's "heightened emotional state," that the police officer's mistaken belief that the suspect had kicked him was objectively unreasonable given the "strong evidence that [the suspect] would be unable to deliver a kick inflicting explosive pain").

Ultimately, the "facts known to [Hawkins] at the precise moment he effectuated the seizure," Hutchins, 959 F.3d at 1132 (cleaned up), were that Banks opened the door with some force after shouting an expletive, Banks was unarmed and not moving toward Hawkins, an unknown object that did not come from Banks hit Hawkins on the head, and that all this was happening at the scene of a suspected domestic disturbance that was no longer volatile and that Hawkins had not witnessed. This is

-8-

not enough to justify the use of deadly force.  See Bauer v. Norris, 713 F.2d 408, 412-13 (8th Cir. 1983) (concluding that force was not justified, even though plaintiffs "were argumentative" and "vituperative," because officers did not give a reason for the stop and there was "virtually no evidence" that (1) "[plaintiffs] actually *physically* resisted or *physically* threatened" the officers, (2) "a crime had been committed in the immediate vicinity," or (3) plaintiffs "were engaged in any wrongful conduct").  Put differently, the facts suggest that Hawkins shot Banks despite perceiving no immediate danger of death or serious bodily injury to himself or to anyone else.  And under these circumstances, no reasonable officer would have believed he had probable cause to use deadly force.[6]

---

[6]To the extent Hawkins argues he is entitled to qualified immunity because he believed Banks would seize his gun, the reasonableness of that belief constitutes yet another material factual dispute.  See Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009) (explaining that "[w]hether [the officer] reasonably interpreted [the suspect's actions] as a realistic threat to his personal safety . . . is a matter for a jury to decide").  A reasonable officer in Hawkins's position—knowing that Banks had not struck him, lacking evidence that Banks had committed a crime, and having no indication that Banks posed an immediate threat—would have had no reason to believe Banks would seize his weapon.  See id. at 497-98 (concluding it was objectively unreasonable for an officer to believe that the suspect would (1) kick the officers when she raised her knees to her chest, given that a jury could interpret it "as an instinctive self-protective reaction," or (2) use nearby glass tumblers as weapons when she did not reach for them or otherwise threaten the officers).

In any event, this argument also depends on Hawkins's claim that he thought he was about to lose consciousness.  The record reflects that Hawkins was sufficiently conscious to point his gun and pull the trigger.  And seconds later, right after shooting Banks, Hawkins was able to place his gun back in its holster, walk several steps inside the house, give Banks instructions, and then physically restrain Banks with his knee.  From these facts, a jury could reasonably infer that Hawkins not only had sufficient control of his faculties, but that he also knew he did.

B.

Johnny Banks's right to be free from excessive force under these circumstances was also clearly established in February 2017. To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable offic[er] would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). The inquiry "must be particularized to the facts of the case," White v. Pauly, 137 S. Ct. 548, 552 (2017), such that "the state of the law" in February 2017 would have given a reasonable officer "fair warning" that shooting Banks "was unconstitutional," Hope v. Pelzer, 536 U.S. 730, 741 (2002).

In evaluating the clarity of the law at the time of the shooting, we may look to precedent not only to define the right at issue, but also to determine the requisite degree of factual similarity. Though "earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." Id. (cleaned up); see also id. (explaining that the "same is true of cases with 'materially similar' facts"). Thus, Banks does not have to point to a nearly identical case on the facts for the right to be clearly established. Our precedent does not set such a prohibitively difficult standard. See Capps v. Olson, 780 F.3d 879, 886 (8th Cir. 2015) ("For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues (cleaned up)); Craighead, 399 F.3d at 962 ("[T]he issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate [the plaintiff's] right not to be seized by the use of excessive force.").

Take, for instance, our decision in Howard v. Kan. City Police Dep't, 570 F.3d 984 (8th Cir. 2009). There, officers pushed the shirtless plaintiff onto hot asphalt and questioned him for several minutes, refusing to move him to a nearby patch of grass despite his persistent complaints of pain and causing him to suffer second-degree

burns. Id. at 987. In concluding that "it was clearly established that the Fourth Amendment was violated if an officer unreasonably ignored the complaints of a seized person that the force applied by the officer was causing more than minor injury," we relied on "a series of cases involving failure to respond to complaints of overly-tight handcuffs." Id. at 991 (collecting cases). It mattered not that hot asphalt is different from tight restraints (arguably a more familiar problem to law enforcement), or that the duration of the challenged conduct differed from that in the cited decisions. See id. at 991-92. Existing case law made the constitutional violation sufficiently clear, even in unique circumstances. See id. at 992. This principle repeats itself in our qualified immunity jurisprudence. See, e.g., Luer v. Clinton, 987 F.3d 1160, 1164, 1169-70 (8th Cir. 2021) (finding constitutional right to be free from "full blown" warrantless search to be clearly established, even where door to the house was already open, based on precedent recognizing the same right when officers breached closed doors); Quraishi v. St. Charles Cnty., 986 F.3d 831, 839 (8th Cir. 2021) (finding constitutional right to be free from an arrest that "interfere[s] with First Amendment activity" absent arguable probable cause to be clearly established where officer deployed tear-gas canister at reporters, based on precedent *not* involving tear gas).[7]

Applying the appropriate level of specificity here, we conclude that a reasonable officer had fair warning in February 2017 that he may not use deadly force against a suspect who did not present an imminent threat of death or serious injury, even if the officer felt attacked earlier and even if he believed the suspect had previously posed a threat. This proposition finds support in at least two cases involving similar, albeit not identical, circumstances: Ellison v. Lesher, 796 F.3d 910 (8th Cir. 2015), and Nance v. Sammis, 586 F.3d 604 (8th Cir. 2009).

---

[7]Other examples include Robbins v. City of Des Moines, 984 F.3d 673, 681 (8th Cir. 2021); Bell, 979 F.3d at 607-08; Z.J. ex rel. Jones v. Kansas City Bd. of Police Comm'rs, 931 F.3d 672, 683-84 (8th Cir. 2019); Johnson v. City of Minneapolis, 901 F.3d at 971; Shekleton v. Eichenberger, 677 F.3d 361, 367 (8th Cir. 2012); Rohrbough v. Hall, 586 F.3d 582, 586-87 (8th Cir. 2009); Brown, 574 F.3d at 499-500.

In Ellison, we considered whether an officer used excessive force when she shot and killed a 67-year-old man in his apartment. 796 F.3d at 913. Similarly to Hawkins, the officers there recounted a potentially dangerous situation and observed signs of "disruption." See id. at 915. When Ellison purportedly "attack[ed]" the officers, "a physical altercation ensued." Id. at 914, 917. Although the altercation was over by that point, Officer Lesher shot and killed Ellison shortly after, alleging—not unlike Hawkins—that Ellison "charged at the officers while swinging a cane." Id. at 916. Because "the facts and circumstances confronting Lesher . . . at the moment when she shot and killed Ellison" were disputed, as they are here, we affirmed the denial of qualified immunity on Ellison's claim against Lesher. Id. at 916-17. Specifically, we found that Lesher used deadly force against an empty-handed suspect who—despite having *pushed* the officers several minutes earlier—Lesher had no reason to believe posed a threat of imminent harm at the time she fired her gun. See id. at 914, 916-17. That Ellison allegedly charged the officers with a cane did not factor into the analysis, because we had to "accept for purposes of our decision that Ellison was not wielding the cane when the shooting occurred." Id. at 917. The same reasoning applies here. We must presume that, at the moment Hawkins shot Banks, there was no longer a threat to Vanessa Banks's safety—assuming there ever was—and Johnny Banks was not charging Hawkins or otherwise moving towards him. As in Ellison, "[i]f [Hawkins] shot [Banks] while he was simply standing in his [home] and holding no [weapon], then there were not reasonable grounds to believe that [Banks] posed a serious threat of death or serious physical injury to the officers or others." Id.

Similarly, the officers in Nance were also responding to a "dangerous situation" when one of them shot the suspect. 586 F.3d at 611. We nevertheless affirmed the denial of qualified immunity because, even though the suspect had a gun in his pants and may have raised his hands while trying to get to the ground, he was not holding the gun or acting in a threatening manner and the officers failed to provide a warning before shooting. Id. at 610-11. In other words, the officers had no "reason to fear for their safety at the time of the shooting." Id. at 610. This means that Hawkins had fair

warning in February 2017 that fear of imminent harm cannot justify shooting a suspect absent a reasonable basis to believe the suspect would act violently in that moment. As in Nance, the fact that Hawkins "knew [he] might encounter a dangerous situation" did "not permit the use of deadly force," even if Banks raised his hand when he opened the front door. Id. at 611.

"[O]n the facts we are bound to assume," Hutchins, 959 F.3d at 1136, Ellison and Nance "clearly prohibit[ed]" Hawkins's conduct, District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). This is further supported by a "body of relevant case law." Johnson v. City of Minneapolis, 901 F.3d at 971 (quoting Wesby, 138 S. Ct. at 590). See, e.g., id. (holding that officer violated clearly established law in 2013 when he "ignored exculpatory evidence," failed to question an eyewitness, and did not observe the crime, yet still arrested the suspect for allegedly kicking him and causing him "explosive pain"); Wallace v. City of Alexander, 843 F.3d 763, 768-70 (8th Cir. 2016) (holding that officer's use of deadly force violated clearly established law where it was disputed whether the suspect engaged the officer in a physical struggle and where the suspect "did not pose an immediate and significant threat of serious injury," "may not have committed any violent felony," and "was not holding a firearm" (cleaned up)); Craighead, 399 F.3d at 962 ("At least since [Tennessee v. Garner, 471 U.S. 1 (1985)] was decided . . . officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others.").

At bottom, while the fact that Hawkins suffered a blow to the head from a source he knew was not Banks may amount to a "novel factual circumstance[]," Hope, 536 U.S. at 741, it does not blur the contours of the constitutional right at issue. Even assuming he thought he was "under attack," the record indicates that Hawkins nevertheless understood he was not under attack *by Banks*.[8] Because a reasonable

_____

[8]The dissent makes much of the fact that Hawkins received a blow to the head, but it cannot explain how being struck by someone or something other than the

-13-

officer in the same circumstances as Hawkins would have known that it was unlawful to shoot an unarmed and nonaggressive man who posed no imminent threat to the officer or to anyone else, we conclude—at this stage of the proceedings—that Hawkins's use of deadly force violated clearly established law.

## III.

"The intrusiveness of a seizure by means of deadly force is unmatched." Garner, 471 U.S. at 9. As our sister circuit recently noted, "to award qualified immunity at the summary judgment stage," when the record reflects significant factual disputes, "would signal absolute immunity for fear-based use of deadly force, which we cannot accept." Estate of Jones ex rel. Jones v. City of Martinsburg, 961 F.3d 661, 673 (4th Cir. 2020). Accordingly, we affirm the district court's order denying Hawkins's motion for summary judgment on Banks's excessive force claim.

STRAS, Circuit Judge, dissenting.

There is no doubt that Officer Shelby Hawkins ended up making a terrible mistake the night he shot Johnny Banks. But it was difficult to know that at the time, especially in light of the unpredictable and dangerous circumstances he faced. All alone and called to the scene of a suspected domestic disturbance, Hawkins saw a truck parked in the driveway with its hazard lights flashing. As he approached the house, he heard a muffled "no, no, no" coming from inside. He knocked on the door, which was at the end of a narrow brick corridor, but there

---

suspect could justify the intentional use of deadly force absent any indication that *the suspect* poses an imminent and significant threat of injury. Even when making "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances, Graham, 490 U.S. at 397, officers cannot ignore what they know. Hawkins may have believed his "life [was] at stake" because of Banks, but on this record, the reasonableness of that belief is for the jury to decide. To the extent the dissent characterizes this ruling as saying anything else, it misreads the message.

-14-

was no answer. Then, after walking around outside and hearing a "loud" noise near the back, he returned to the front, drew his gun, and began kicking the door. Someone inside said "[w]ho the fuck is this?" and opened the door with a "little bit of force." Standing there was Banks, who had one hand on the wall "about head high." Suddenly, something hit Hawkins in the head. Though that "something" did not come from Banks, Hawkins reacted by "immediately" shooting him in the leg.

The question for us is whether Officer Hawkins is entitled to qualified immunity. Whether his actions that night were objectively reasonable is a close call, and I tend to agree with the court that it is likely one for a jury to decide. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Zubrod v. Hoch*, 907 F.3d 568, 577 (8th Cir. 2018). But qualified immunity applies precisely when an officer is forced to make a hard choice. *See Sumpter v. Wayne County*, 868 F.3d 473, 488 (6th Cir. 2017) ("Qualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white."). After all, officials *lose* it only when they act "plainly incompetent[ly]" or "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And here, there is no way to conclude that Hawkins did either. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (internal quotation marks omitted)).

The court reaches a different conclusion, but only by defining the constitutional right in question at a high degree of generality. The Supreme Court has told us over and over again that any "general[ized]" right, such as the right to be free from the unreasonable "us[e of] deadly force," must be "clearly established" in a "particularized . . . sense" to overcome qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 197–99 (2004) (per curiam) (quotation marks omitted). It is not here.

-15-

The court says that Officer Hawkins should have known that he could "not use deadly force against a suspect who did not present an imminent threat of death or serious injury, even if [he] felt attacked earlier and even if he believed the suspect had previously posed a threat." *Ante* at 11. Not only is this formulation so broad that it lacks clarity, it also risks sweeping too broadly. The proof is in the pudding: there are cases that both fall within the court's supposed clearly established rule *and* do not involve the violation of a constitutional right. If you are wondering how both can be true, they cannot be.

One example is *Ransom v. Grisafe*, 790 F.3d 804 (8th Cir. 2015) (per curiam). There, officers received a report of gunshots "fired from or near" a van. *Id.* at 807. When the officers arrived, they parked behind it and heard what they thought were more gunshots. *See id.* at 807–08. It turned out that it was just backfire from the van and not gunfire from the driver or someone hiding in "a [nearby] ditch," but they shot at the driver eight times when he emerged anyway. *Id.* We held that qualified immunity was available because, "[t]hough [the driver] had done nothing wrong, . . . the officers' fear of harm was reasonable." *Id.* at 811.

If *Ransom* sounds similar to this case, it is. In both, officers used deadly force against a suspect who did not present an imminent threat of death or serious injury, so if the court's proposed rule is as clearly established as it says it is, then *Ransom* should have come out the other way.[9] Yet we held that, despite the fact

---

[9]There are other examples, too. *See, e.g.*, *Corbitt v. Vickers*, 929 F.3d 1304, 1308 (11th Cir. 2019) (involving an officer who shot at a dog but accidentally hit a 10-year-old child who was complying with commands and posing no threat to the officer or others); *Mullins v. Cyranek*, 805 F.3d 760, 763–64 (6th Cir. 2015) (involving an officer who fired two shots at a suspect a few seconds *after* that suspect was no longer a threat); *McLenagan v. Karnes*, 27 F.3d 1002, 1005 (4th Cir. 1994) (involving an officer who shot an unarmed, handcuffed man after someone shouted "The man has got a gun!" without specifying who). Each case involved a grant of qualified immunity, even though every one of them falls within the rule identified by the court.

that the driver posed no danger, the officers could use deadly force because their "fear of harm was reasonable." *Id.* Based on *Ransom*, a reasonable officer in Officer Hawkins's shoes would not have had "fair notice" that shooting Banks that night was constitutionally excessive. *Kisela*, 138 S. Ct. at 1152 (quotation marks omitted).

The court, for its part, points to two other cases, but neither involves "similar circumstances," *District of Columbia v. Wesby*, 138 S. Ct. 577, 591 (2018) (quotation marks omitted), or "squarely governs the specific facts at issue," *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted). The first case, *Ellison v. Lesher*, involved two off-duty police officers who entered a 67-year-old man's apartment after he gave "mouthy" answers. 796 F.3d 910, 913–14 (8th Cir. 2015). The officers ended up in a tussle with the man, whom they shot and killed when he allegedly swung his cane in a threatening manner. *See id.* at 914, 916–17. We denied qualified immunity because a factual dispute existed over whether the man "was [actually] holding his cane when he was shot." *Id.*

For at least two reasons, *Ellison* does not involve "similar circumstances." *Wesby*, 138 S. Ct. at 591 (quotation marks omitted). First, Officer Hawkins was called to the scene of an uncertain and potentially volatile situation: a domestic disturbance happening behind closed doors. The officers in *Ellison*, by contrast, knew exactly what they faced once they walked by the apartment and saw a "relaxed" man "sitting on his couch." 796 F.3d at 913. Second, it is undisputed that Hawkins was hit on the head right after Banks used an expletive and opened the door with a "little bit of force."[10] Despite these differences, the court's position is that *Ellison* is similar because "[Hawkins] shot [Banks] while he was simply

---

[10]Although the blow did not come from Banks, the fact that Officer Hawkins was hit on the head by *something* is undisputed, and there is no question that it immediately preceded the gunshot, making it "material" to "the outcome" under any definition of that word. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that a "material" fact "might affect the outcome of the suit under the governing law").

standing in his [home] and holding no [weapon]." *Ante* at 13 (brackets in original) (quoting *Ellison*, 796 F.3d at 917). This statement, even if literally true, just frames the issue in a way that ignores the differences.

The other of the court's two cases, *Nance v. Sammis*, is so far afield that Banks did not even bother to cite it. 586 F.3d 604 (8th Cir. 2009). It involved a fatal shooting of a 12-year-old boy carrying a toy gun. *See id.* at 607. Viewing the facts in the light most favorable to the plaintiffs, we "presume[d] that the officers approached [the boy] without identifying themselves as police officers, that the toy gun was tucked in [his] pants throughout the entire confrontation, that [the officers] only said to drop the gun and get on the ground, and that [he] may have raised his hand or hands while trying to get to the ground before [an officer] shot him twice without warning." *Id.* at 610–11.

As this summary should make obvious, *Nance* is a completely different case. The only connection the court can draw, in fact, is that the officers there "were also responding to a 'dangerous situation' when one of them shot the suspect." *Ante* at 13 (quoting *Nance*, 586 F.3d at 611). It is true that both situations may have been dangerous and ended in a shooting, but the similarities end there. In *Nance*, the officers were never struck by *anything*, much less in the head, and they had the opportunity to observe what the boy was doing the entire time. *See* 586 F.3d at 607.

For these same reasons, we are also not confronted with "the rare[,] obvious case" in which the unlawfulness of Officer Hawkins's conduct is so clear that "a body of relevant case law" is unnecessary. *Wesby*, 138 S. Ct. at 590 (internal quotation marks omitted). After receiving a blow to the head, he had to make "[a] split-second judgment[]—in circumstances that [were] tense, uncertain, and rapidly evolving"—to ensure his own safety. *Graham*, 490 U.S. at 397. It is true that he ended up making the wrong call when he shot an unarmed man, but it is not fair to say that, at the time, his choice was *obviously* wrong. *See id.* at 396 ("The

-18-

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

Today's decision does more than just expose Officer Hawkins to liability. It stands as a warning to other officers who may need to make split-second decisions to protect their own safety. The message could not be clearer: even in the absence of a clearly controlling legal rule, think twice before acting, regardless of whether your own life is at stake, because a court may step in later and second-guess your decision. *See Malley*, 475 U.S. at 341. We can reasonably disagree about whether qualified immunity should exist, *see Baxter v. Bracey*, 140 S. Ct. 1862, 1864–65 (2020) (Thomas, J., dissenting from the denial of certiorari), but there is no question that circumstances like these are why it does, *see Winzer v. Kaufman County*, 916 F.3d 464, 482 (5th Cir. 2019) (Clement, J., dissenting in part). I respectfully dissent.

————————————————